THE STATE, EX REL. JOHN W. PANGBORN ET AL., COM-
MISSIONERS OF POLICE, v. EDMUND F. C. YOUNG, CITY
TREASURER.

THE SAME v. JOSEPH McMANUS.

1. Where an act has been passed by the legislature, and signed by the
   speaker of each house, approved by the governor as authenticated by
   his signature, and filed in the office of secretary of state, an exempli-
   fication of it under the great seal is conclusive evidence of its exist-
   ence and contents.
2. It is not competent for this court to go behind this attestation, or to
   admit evidence to show that the law as actually voted on and passed
   and approved by the governor, was variant from that filed in the
   office of the secretary of state.
3. The minutes of the two houses, or of either of them, although kept
   under the requirements of the constitution, cannot be received as evi-
   dence for such purpose.

On the 23d of March, 1866, the legislature passed an act,
entitled, "an act to establish a police district in the county of
Hudson, and to provide for the government thereof." At
the time of the passing of this act, one of the defendants
above named was the treasurer of Jersey City, and the other
one the chief of police, appointed by the municipal authori-
ties of the city, under the then existing organization.

Under the new law, commissioners were appointed by the
governor, with the advice and consent of the senate, and were
vested with the powers and duties incident to, and connected
with, the police government and discipline of the district.
The officers above named refused to recognize these commis-
sioners, or act under their authority, upon the ground that the
law, in virtue of which they were appointed, was invalid, never
having been constitutionally passed. The treasurer refused to
pay checks drawn on him by the commissioners; and the
chief of the police refused to deliver up to the board of com-
missioners the books, papers, and property belonging to the
police department, as required by the act.

The commissioners thereupon applied to this court for a writ of *mandamus*, to be issued against each of said parties so refusing as aforesaid, commanding him to comply with the requirements of the said commissioners.

Affidavits were taken upon both sides, and the case was heard at the present term before the CHIEF JUSTICE, and Justices ELMER, WOODHULL, and DALRIMPLE.

For the state, *Jacob Weart* and *Cortlandt Parker*.

For the defendants, *Charles H. Winfield* and *J. P. Bradley*.

THE CHIEF JUSTICE. This controversy relates to an act of the legislature, passed on the 23d day of March, 1866, entitled, "an act to establish a police district in the county of Hudson, and to provide for the government thereof."

The general purpose of this legislative enactment was, to abolish the ancient system of police, of which the mayor and other municipal authorities of Jersey City had been the organs, and to transfer the power belonging to that department to a board of three commissioners, to be appointed by the governor, with the consent of the senate of the state. It is not denied that the relators are the commissioners, duly chosen and installed into office under this act, the defendants being respectively the treasurer of Jersey City and the chief of police under the old organization.

By the 16th section of the act in question, the commissioners are authorized to pay all claims arising under its provisions, by checks drawn, in a manner which is prescribed, on the treasurer of Jersey City. Sundry checks have been issued by the board of commissioners to pay debts by them officially contracted, the payment of which, when presented, was refused by the treasurer of the city. This is the transaction which forms the basis of the application for the *mandamus*, in the case first above stated.

The alleged necessity for the *mandamus* in the second case arises from the refusal of Mr. McManus, who was the

chief of police in the old system, to obey the orders of the new board of commissioners, and to deliver to them "the books, papers, and property" belonging to the police department, according to the requirements of the 23d section of the act above referred to.

Besides certain technical matters which will be noticed hereafter, the defendants have interposed as a defence in both their cases, the objection that the act of the legislature, creating the relators a board of police, was not enacted in conformity to the requirements of the constitution of this state, and on that account is illegal and altogether void. This allegation is founded in certain facts which, it is alleged, appear upon the journals of the senate and house of assembly. From an inspection of these journals, it appears that the act under consideration originated in the lower house, through which it passed in the usual form; that, upon its transfer to the senate, it received in that body certain important amendments, and in that altered condition, was returned to the assembly, which, concurring in the amendments, adopted and passed it as in ordinary cases. It is further alleged, that this bill, as modified by the senate, was never presented to the governor for his approval, and is not the bill which has received the executive sanction, and which is now deposited in the office of the secretary of state. It is insisted that, by a mistake, which is not explained, the bill, as it originally passed the house of assembly, and before the introduction of amendments by the senate, was certified to by the speaker of each house, and is the act now filed in the office of the secretary of state, bearing the signature of the executive. Upon this state of facts, it is insisted that the amended bill, as adopted by both houses, has never received the approval of the governor, which, being a constitutional requisite, cannot be dispensed with, and that the bill to which the governor's signature is annexed was not the act, which, in point of fact, was passed into a law by the vote of the senate, and that, as an unavoidable consequence, neither bill is to be regarded as a legislative act which is enforceable by

the courts. It is not in the least to be doubted that, on the assumption of the truth of these premises, the conclusion thus drawn is correct. A legislative bill, which wanted the approval of either the assembly or the senate, or that of the governor, would be so plainly defective, on constitutional grounds, that this court could not hesitate, in the exercise of its clearly legitimate power, in declaring it absolutely void. Such, indeed, in the argument, was not denied to be the inevitable result, as an induction of law, if the facts above noted were to be received and considered by the court. The entire controversy, and the learned discussion at the bar which followed, and which has so materially assisted the labors of the court, turned upon another point, which was the very important question, whether the court, under its admitted power to inform itself with regard to the existence of the general laws of the state, was authorized to go behind the copy of a legislative act on file in the office of the secretary of state, and which is authenticated with the usual solemnities. It will be at once perceived that this is a topic of much delicacy and of great moment, for it relates to the right of the judiciary to institute its own modes of inquiring into the action of the legislative department of the government, as well as to exercises of its authority, based upon such an inquiry, to restrain such departments within constitutional limits. The subject has received that careful consideration at the hands of the court, which was due to a matter involving such important principles and affecting such high public interest.

From the foregoing statement, it is apparent that the investigation before the court belongs entirely to that branch of legal science which embraces and illustrates the laws of evidence. The precise point to be considered is thus advanced in the arguments of counsel : on the part of the plaintiff, it is maintained that the act, as found in the office of the secretary of state, exemplified under the great seal, is conclusive evidence of the existence and contents of the statute ; while, on the other hand, it is urged that, when a doubt arises or is suggested, whether, in the passage of the act, the

Pangborn et al. v. Young.

substantial forms of the constitution have been observed, the court will satisfy itself on these points by a reference to the journals of the two houses of the legislature. In order clearly to comprehend these opposing positions, it is necessary to understand, with clearness, what the instrument of evidence is, which, by one party, is asserted to have the effect to forbid all ulterior inquiry, as well as that other instrument to which, by the other party, it is insisted the court, under proper circumstances, has the right to revert. First, then, as to the copy of the act on the files in the office of the secretary of state.

From the earliest times, so far as I have been able to ascertain, it has been the invariable course of legislative practice in this state, for the speaker of each house to sign the bill as finally engrossed and passed. It is likewise certified by endorsement by the clerk of the house in which it originated. With these attestations of authenticity upon it, it is then filed in the office of the secretary of state. This has been the course of proceeding from certainly a very remote period to the present time; under our present constitution the written approval of the governor is requisite. There seems, therefore, to be no doubt whatever that these copies, thus authenticated and filed, are to be regarded as enrolled bills, corresponding in their general character, and partaking, if not in all, at least in most respects, of the nature of parliamentary rolls. In the statute book they are frequently referred to as enrolled bills; and if we go back to provincial times, we find endorsed upon these copies, with the executive approval, a direction to enroll them, which meant nothing more than that they were to be filed. These are the characteristics and nature of the copies of legislative bills deposited according to the ordinary routine in the office of the secretary of state.

Next, then, with regard to the journals of the two houses of the legislature. Each house keeps one of these memorials by the express injunction of the constitution. The provision is found in *Article IV.*, § 4, *par.* 4.* Its language is,

"each house shall keep a journal of its proceedings, and from time to time publish the same; and the yeas and nays of the members of either house, on any question, shall, at the desire of one-fifth of those present, be entered on the journal." And by the last clause of paragraph sixth, in the same section, it is further directed, with regard to the form of enacting bills, "that the yeas and nays of the members voting on such final passage shall be entered on the journal." These are all the constitutional requirements relating to these diaries; and it will be observed that, with the exception of recording the yeas and nays on certain occasions, there is no prescription in the constitution of what they shall contain. They are not required to be attested in any way whatever; nor is it said that they shall even be read over to the house, so that their correctness may stand approved.

From this comparison, it seems to me, it is impossible for the mind not to incline to the opinion that the framers of the constitution, in exacting the keeping of these journals, did not design to create records which were to be paramount to all other evidence with regard to the enactment and contents of laws. At the time of the formation of the constitution, the mode of authenticating statutes, by a copy enrolled in the office of the secretary of state, was completely established by common usage and by the sanction of its antiquity, and it was also obvious that a copy of an act thus enrolled was, in every essential particular, almost identical with a roll of parliament, which, it was well known, was not only admissible in evidence, but was conclusive as to the existence and provisions of the law which it embodied. Possessed of this knowledge, it is difficult to believe that the eminent jurists who, as delegates, helped to frame the constitution of 1844, meant to substitute a journal, which was devoid of all the ordinary marks of authenticity, considered as a means of proof in a court of law, for a record which, in point of evidential efficacy, had no superior. If intended as evidence for any purpose whatever in any course of judicial investigation, can any one conceive that these registers would have

Pangborn et al. v. Young.

been left in the condition in which, by the constitution, we find them? In the nature of things, they must be constructed out of loose and hasty memoranda, made in the pressure of business and amid the distractions of a numerous assembly. There is required not a single guarantee to their accuracy or to their truth; no one need vouch for them, and it is not enjoined that they should be either approved, copied, or recorded. It must be admitted, I think, from these considerations, that a strong presumption arises that it was not the purpose of those who framed the constitution, in enjoining each house to keep a journal, to establish such journals as the ultimate and conclusive evidence of the conformity of legislative action to the constitutional provisions in the enactment of laws.

But, independent of this question of intention, as exhibited in our primary law, the more general inquiry arises, can the court resort to this source of information to satisfy itself on the point whether a legislative act has been thus constitutionally passed?

The first consideration which naturally suggests itself in this connection is, that the legislature has, with care and a wise precaution, adopted a mode of certifying its own acts in an authentic form. And, indeed, so completely has this purpose been effected, that it appears hardly practicable to suggest additional safeguards. To the correctness of the present bill, for example, we have the signature of the presiding officer of each house. In its present form, it was exhibited to the governor as the bill which had been enacted, and as such received his approval, as is evidenced by his signature. It was then immediately made public by being filed in the office of the secretary of state. These are the sanctions which the legislature has provided for the authentication of its own acts, both to the public and to the judicial tribunals, and the question is therefore presented, whether such authentication must not be deemed conclusive, or in other words, whether the legislature does not possess the right of declaring what shall be the supreme evidence of

the authenticity of its own statutes. This question, in my opinion, must be answered in the affirmative. How can it be otherwise? The body that passes a law must of necessity promulgate it in some form. In point of fact, the legislative power over the certification of its own laws is of necessity almost unlimited, as will appear from the circumstance that, with regard to the body of an act, there is no evidence of any kind but that which the legislature ·itself furnishes in the copy deposited in the state archives. The journals do not purport to contain more than the amendments, so that the legislative control is absolute with regard to the essential parts of the laws which are enacted. We are also to reflect that it is the power which passes the law, which can best determine what the law is which itself has created. The legislature in this case has certified to this court, by the hands of its two principal officers, that the act now before us is the identical statute which it approved, and, in my opinion, it is not competent for this court to institute an inquiry into the truth of the fact thus solemnly attested.

· Nor do I think this result is to be deprecated. I think the rule thus adopted accords with public policy. Indeed, in my estimation, few things would be more mischievous than the introduction of the opposite rule. A little reflection will satisfy most persons of the truth of this remark. Let us examine the proposition in a few words.

The rule contended for is, that the court should look at the journals of the legislature to ascertain whether the copy of the act attested and filed with the secretary of state conforms in its contents with the statements of such journals. This proposition means, if it has any legal value whatever, that in the event of a material discrepancy between the journal and the enrolled copy, that the former is to be taken· as the standard of veracity, and the act is to be rejected. This is the test which is to be applied not only to the statute now before the court, but to all statutes; not only to laws which have been recently passed, but to laws the most ancient. To my mind, nothing can be more certain than that the accept-

ance of this doctrine by the court would unsettle the entire statute law of the state. We have before us some evidence of the little reliability of these legislative journals, to which, in this place, it is well to advert. This reference should be premised with the remark that an examination of the journals alluded to in the evidence, revealed the fact that they were made up of entries partly in pencil, partly in ink, and of scraps in print, taken from newspapers. The witness, in the testimony above mentioned, says: "I have examined these portions of the senate journal relating to the police bill. With *two exceptions,* they show the amendments that were added to that bill in the senate as it came from the assembly. When amendments had been agreed to without objection, they were not inserted in the journal, it not being usual to insert amendments in the journal, except when the yeas and nays were called, or the *bill or amendments were of some particular importance.*" And again the witness says: "It is quite an usual thing to dispense with the reading of the journal in the senate." Hence, it appears that these journals do not contain amendments not objected to, and which the clerk deems of little importance, and that, in the ordinary course, they are not even submitted for approval to the body whose acts they purport to record. Evidence which would seem less reliable it is hardly possible to present to the legal mind; it has not one of the guarantees, which, even to the most ordinary transaction, are required to raise a presumption in favor of testimony. Can any one deny that, if the laws of the state are to be tested by a comparison with these journals, so imperfect, so unauthenticated, · that the stability of all written law will be shaken to its very foundations? Certainly, no person can venture to say that many of our statutes, perhaps some of the oldest and most important, those which affect large classes of persons, or on which great interests depend, will not be found defective, even in constitutional particulars, if judged by this criterion. The misplacing of a name on a nicely balanced vote, might obviously invalidate any act. What

assurance is there, therefore, that a critical examination of these loosely kept registers will not reveal many fatal errors of this description? In addition to these considerations in judging of consequences, we are to remember the danger, under the prevalence of such a doctrine, to be apprehended from the intentional corruption of evidences of this character. It is scarcely too much to say that the legal existence of almost every legislative act would be at the mercy of all persons having access to these journals; for it is obvious that any law can be invalidated by the interpolation of a few lines, or the obliteration of one name, and the substitution of another in its stead. I cannot consent to expose the state legislation to the hazards of such probable error or facile fraud. The doctrine contended for on the part of the defence has no foundation, in my estimation, in any considerations of public policy.

The principal argument in favor of this judicial appeal from the enrolled law to the legislative journal, and which was much pressed in the discussion at the bar, was, that the existence of this power was necessary to keep the legislature from overstepping the bounds of the constitution. The course of reasoning urged was, that if the court cannot look at the facts and examine the legislative action, that department of government can, at will, set at defiance, in the enactment of statutes, the restraints of the organic law. This argument, however specious, is not solid. The power thus claimed for the judiciary would be entirely inefficacious, as a controlling force, over any intentional exorbitance of the lawmaking branch of the government. If we may be permitted, for the purpose of illustration, to suppose the legislature to design the enactment of a law in violation of the principles of the constitution, a judicial authority to inspect the journals of that body, would interpose not the slightest barrier against such transgression, for it is obvious that there could not be the least difficulty in withholding from such journals every fact evincive of such transgression. A journal can be no check on the actions of those who keep it, when a violation of duty is intentional. It cannot, therefore, fail to be observed how

inadequate to the correction of the supposed evil is the pro-
posed remedy.   Besides, if the journal is to be consulted, on
the ground of the necessity of judicial intervention, how is it
that the inquiry is to stop at that point ?   In law, upon ordi-
nary rules, it is plain that a journal is not a record, and is,
therefore, open to be either explained or contradicted by
parol proof.   And yet, is it not evident that the court could
not, upon the plainest grounds, enter upon such an investi-
gation ?  In the case now in hand, if the offer should be made to
prove by the testimony of every member of the legislature
that the journals laid before us are false, and that, as a matter
of fact, the enrolled law did receive, in its present form, the
sanction of both houses, no person versed in jurisprudence, it
is presumed, would maintain that such evidence would be com-
petent.   The court cannot try issues of fact ; nor, with any
propriety, could the existence of statutes be made dependent
on the result of such investigations.   With regard to matters
of fact, no judicial unity of opinion could be expected, and
the consequence would necessarily be, that the conclusion of
different courts, as to the legal existence of laws, from the
same proofs, would be often variant, and the same tribunal
which to-day declared a statute void, might to-morrow be
compelled, under the effect of additional evidence, to pro-
nounce in its favor.   The notion that the courts could listen
upon this subject to parol proof is totally inadmissible, and
it therefore unavoidably results that if the journal is to be
taken into consideration at all, its effect is uncontrollable:
neither its frauds can be exposed, nor its errors corrected.
And if this be so, and the journal is to limit the inquiry of
the judicial power, how obvious the inadequacy, if not futility,
of such inquiry !   In my estimation, the doctrine in question,
if entertained, would, as against legislative encroachments, be
useless as a guard to the constitution, and it certainly would
be attended with many evils.   Its practical application would
be full of embarrassment.   If the courts, in order to test the
validity of a statute, are to draw the comparison between the
enrolled copy of an act and the entries on the legislative jour-

nal, how great, to have the effect of exploding the act, must be the discrepancy between the two? Will the omission of any provision, no matter how unimportant, have that effect? The difficulty of a satisfactory answer to these and similar interrogatories is too apparent to need comment. And again, to notice one among the many practical difficulties which suggest themselves, what is to be the extent of the application of this doctrine? If an enrolled statute of this state does not carry within itself conclusive evidence of its own authenticity, it would seem that the same principle must be extended to the statutes, however authenticated, of other states. An act, therefore, of Virginia or California, with regard to the mode of its enactment, would be open to trial as a matter *in pais*. And, indeed, the doctrine, if carried to its legitimate conclusion, would seem to abolish altogether the conclusiveness even of international authentications; for if the great seal of this state, attesting the existence of a statute, is not final, it is not perceived how a greater efficacy is to be given to the seal of a foreign government.

In addition to the foregoing observations, I cannot close this part of my examination of the question under discussion without adverting to a further consideration, which, to my mind, appears to be entitled to very great, if not decisive weight. I here allude to the circumstance that, in the structure of the government of this state, the judicial and legislative departments are made co-equal, and that it no where appears that the one has the right of supervision over the other. It is true, as was much pressed on the argument, that the legislative branch may wilfully infringe constitutional prescriptions. But the capacity to abuse power is a defect inherent in every scheme of human government, and yet, nevertheless, the forces of government must be reposed in some hands. The prerogatives, to make, to execute, and to expound the laws, must reside somewhere. Depositaries of those great national trusts must be found, though it is certain that such depositaries may betray the

confidence thus reposed in them. In the frame of our state government, the recipients and organs of this three fold power are the legislature, the executive and judiciary, and they are co-ordinate—in all things equal and independent; each, within its sphere, is the trusted agent of the public. With what propriety, then, is it claimed that the judicial branch can erect itself into the custodian of the good faith of the legislative department? It is to be borne in mind that the point now touched does not relate to the capacity to pronounce a law, which is admitted to have been enacted, void, by reason of its unconstitutionality. That is clearly a function of judicature. But the proposition is, whether, when the legislature has certified to a mere matter of fact, relating to its own conduct and within its own cognizance, the courts of the state are at liberty to inquire into or dispute the veracity of that certificate? I can discover nothing in the provisions of the constitution, or in the general principles of government, which will justify the assumption of such superior authority. In my opinion, the power to certify to the public the laws itself has enacted, is one of the trusts of the constitution to the legislature of the state.

Neither do I think, if we turn from these general considerations, to regard judicial sentiment and the authority of decided cases, that we are led to any other conclusion than the one above expressed. A brief reference to a few of the more important of the decisions will, I think, justify this opinion.

In England, the legal principle upon the point now presented for this court appears to have been entirely at rest from an early day. The leading case in that country is that of *Rex* v. *Arundel*, reported by Lord Hobart, *p.* 110, and the remarkable similarity between the question involved in the controversy there reported and the one now before us for decision should not escape observation. The facts were the following, *viz.*, it appeared that a bill had passed the upper house by the consent of the lords, and had been sent to the lower house, and from thence had been returned, with

a certain proviso annexed to it. This bill was filed with the rest of the bills, and was marked with the royal assent. As this was a private bill, it was not enrolled in the Court of Chancery, as was the usage with acts of a public nature. The attempt on the trial in the Court of Chancery was to show by the journal of the upper house that the *proviso, which was omitted in the copy filed,* had been passed as a part of the bill. Then, as in the principal case, the question was upon the point of the admissibility of the parliamentary journal, to impeach the bill on the files, on the ground that the latter did not contain all the provisions which had received the sanction of one of the houses; but the court resolved that the journal could not be used as evidence for that purpose. And the distinction is drawn in the clearest manner, between an infirmity appearing in the act itself, as where it purported to have been passed without the concurrence of the commons, and a defect revealed only by the journal; the former being regarded as an incurable imperfection; the latter, as an objection impossible, according to the laws of evidence, to be proved. This doctrine, which is founded on still earlier decisions, reported in the year books, has been, I am satisfied, the undisputed law of the English courts from that day to the present. It has received the sanction of Lord Coke, (the case of heresy, 12 *Rep.* 58,) and the principle was carried so far by Lord Hale, that, in a case where the defendant pleaded that a bill wanted the royal assent, he would not permit the question to be raised, but held that the certificate of the bill from the Court of Chancery, where it had been recorded, was conclusive. *College of Physicians and Cooper and Herbert,* 3 *Keb.* 587. Nor can it, I think, be denied that a statute properly attested by seal, everywhere, in the common law, is regarded as a method of evidence, equal and equivalent to the copy of a judgment formally exemplified. They each import absolute verity; to neither can the plea of *nul tiel* record be applied: their existence and contents can be tried only by inspection. No English judge, as far as I am aware, has

ever dropped a hint that, as an instrument of evidence, a statute does not stand on the same level with a judgment. I think that all persons must admit that this is the rule of the common law. How is it, then, that this court is to dispense itself from the enforcement of this rule so clearly established and so ancient? But one suggestion in this respect was made by counsel, and that was, that the English rule was not applicable to the present condition of affairs here, growing out of the written constitution of this state. But I cannot perceive the force of this argument. The constitution of this state, it is true, requires each house of the legislature to keep a journal of its proceedings; but, as already remarked, neither by expression nor by implication is such journal made evidence in so supreme a degree that it can be used to annul or impeach a record. Besides, by prescription and immemorial usage, journals of their proceedings are kept by parliament, and which, for certain purposes, have always been recognized by the courts, and there seems to be no reason whatever to hold that, considered as a means of proof in any course of law, such journals stand in a rank inferior to those which are kept by the legislature, under the direction of the constitution of this state. I see nothing in this particular which will prevent the application of the rule of the common law to this case. Nor do I think there is anything which will produce a different result in the fact that, in this state, the legislature are constrained to enact laws in the modes marked out in a written constitution. The parliament of England is not possessed of arbitrary powers; it is as incapable as our own legislature of passing a law, except in a certain definite and prescribed form; a statute which had not received the approval of either house or of the executive would be void, either in Great Britain or in this state. The difference is simply between restrictions upon the lawmaking power established by usage and those committed to writing: a difference which does not seem to affect, in any substantial manner, the question of evidence now considered. The same common law principle which gives the quality of

conclusiveness to a parliamentary roll, must, therefore, as a part of the unquestionable law of this state, and which this court has no choice but to enforce, impart the same force to an enrolled act of the legislature of this state.

My general conclusion, then, is, that both upon the grounds of public policy and upon the ancient and well-settled rules of law, the copy of a bill attested in the manner above mentioned, and filed in the office of the secretary of state, is the conclusive proof of the enactment and contents of a statute of this state, and that such attested copy cannot be contradicted by the legislative journals, or in any other mode.

In conformity with the foregoing view, I regard the decided weight of American authority. It was not deemed necessary to review the cases. The following will be found to support substantially the conclusion above expressed. *The Pacific R. Co.* v. *The Governor*, 23 *Miss.* 353; *Fouke* v. *Fleming*, 13 *May'd* 412; *Duncombe* v. *Prindle*, 12 *Iowa* 1; *Peo.* v. *Purdy*, 2 *Hill* 31; *S. C.*, 4 *Hill* 384; *Eld* v. *Graham*, 20 *Conn.* 16.

On the argument of these cases, the further ground was assumed that neither of them was of such a character as to warrant the issue of the writ of *mandamus*. But the court cannot concur in this view. In the one case, the court is asked to compel the chief of police to submit to the authority of the board of commissioners, and to deliver up to them certain property to which, by force of the statute, they are entitled; and in the other case, the intervention of this court is sought to require the city treasurer to honor the draft of the commissioners, in obedience to the same law. In each case, the application is to this court for its prerogative writ to constrain a public officer to discharge a duty incident to his office, which is no degree discretionary, and for the breach of which there is no other specific or adequate remedy. Each case appears to come clearly within the office of the *mandamus*. 8 *Mod.* 28; *Bac. Ab., tit. Man. (D.;) Rex* v. *Buller*, 8 *East* 389; *Rex* v. *Gravesend*, 2 *B. & C.* 602, 1.

Let the writs issue according to application.

ELMER, J.   I entirely agree with the Chief Justice.   It could not be denied by the counsel who so ably argued these cases for the defendants, that, by the common law, at least up to the adoption of the state constitution, in 1776, the public statutes enacted by "the governor, the council and general assembly," regularly engrossed, and signed and deposited in the office of the secretary of the colony, were held to be, like the public acts of the parliament of England enrolled in chancery, "records of the highest and most absolute proof," whose correctness could not be questioned.

All public laws, whether classed as the unwritten or common law, or as the written or statute law, are considered to be known and understood, not only by the judges and officers whose duty it is to enforce them, but by every individual who is bound to obey them.   Before the invention of printing, acts of parliament were published by the sheriff of every county, the king's writ being sent to him at the end of every session, together with a transcript of every public act, and the usage was to proclaim these at his county court, and there to keep them, that whosoever would might read or take copies of them ; and it appears by the proceedings upon an indictment in the county court of Cape May, in 1693, that a somewhat similar practice prevailed in West Jersey. In modern times, statutes are promulgated and made accessible by means of the enrolled acts, duly signed by the presiding officers of the two houses of the legislature and the governor, and deposited as public records in the office of the secretary of state, of which all persons are entitled to have copies, and by being printed and published, under the supervision of a proper officer, in books and newspapers.   When required to be acted on in a court of justice or elsewhere, it is not necessary to produce any proof of their existence or purport, it being the duty of the judges and others to know what they are.   As they are now very numerous and complicated, of course it is often necessary to have recourse to the printed copies, and in case of any doubt of their accuracy, to the originals, or a certified copy thereof.   There is not only no evidence

of any attempt having been made in this colony and state to dispute the correctness of the original record, but there is every reason to believe that it has always been understood that this could not be done.

The argument relied on by the counsel now, and that adopted by the judges of those state courts in the United States, which, differing from the majority of the courts in which the question has arisen, have admitted proof that what was enrolled and published as a statute had not been duly enacted is, that inasmuch as the state constitutions have prescribed certain requisites, without the observance of which no law can be constitutionally enacted, it has become the province of the courts, although no such power has been, in terms, conferred on them, to see that these requirements have not been neglected. *Fowler* v. *Pearce*, 2 *Cal. R.* 165; *Turley* v. *County of Logan*, 17 *Ill.* 151; *Supervisors* v. *Heenan*, 2 *Minn.* 330.

Upon the adoption of written constitutions by the colonies separately and unitedly, it became a question, which was considerably discussed, whether the courts were entitled to declare a law invalid, upon the ground that it was, in its terms, opposed to the constitution of the state, or of the Union. It was, however, soon held, and is the established doctrine of the American law, that this duty is incumbent on them as interpreters of the laws, and obliged of necessity, in case of conflicting provisions, to determine which are obligatory, and which are not. The English courts have held that an act of parliament, clearly contrary to natural equity as to make a man a judge in his own cause, is void, upon the ground that the law of natural equity is always binding and paramount to all human authority. But an investigation of the legislative proceedings, in passing a law, is a very different thing. The legislature is in no respect subordinate to the judiciary; but, on the contrary, is entitled to prescribe the rules of evidence to be observed by the courts, and this, of necessity, includes the power of prescribing how their acts shall be authenticated.

It is true that the constitutions of this state, as adopted in 1776 and in 1844, embrace positive provisions obligatory upon the legislative bodies, regulating the mode of enacting laws, and that now in force requires each house to keep a journal of its proceedings, and from time to time publish the same. But there is no indication of a design to alter the mode long in use and well understood, of authenticating their acts, or to make the journals, or the recollection of individuals, evidence of their regularity. The main object of the provision respecting journals evidently is, to require the voters to be informed of the manner in which their representatives had executed the trust reposed in them. Both these instruments declare, in express terms, that the common law then in force, shall remain until altered by the legislature. Each house of parliament was accustomed to keep a journal, and the assent of both houses, as well as the crown, to every part of a statute, was and is essential to its validity; but the enrolled act, by the rules of the common law, as declared by the courts, was and is conclusive evidence that it was duly enacted. These rules have never been altered in this state, and are as binding now as they ever were.

There can be no doubt, I suppose, that it is competent for the legislature to prescribe a different mode of enrolling and proving the laws, as, in fact, has been done, in regard to private acts and foreign laws, and in regard to bills which pass both houses of the legislature and become laws, without the approval of the governor. It may be, indeed, that the occurrence of such a fraud or neglect of the officers and committees whose duty it was to correctly engross and compare the bill in question, with all the amendments adopted by either house as has now been disclosed, shows that it would be wise to provide a direct mode by which, in case of a question being raised within a limited time, this court may judicially inquire and decide whether an act formally signed and enrolled has been constitutionally enacted, as we now, by virtue of our prerogative power to control all inferior judicatories, inquire into and determine the validity of ordi-

nances adopted by our numerous municipal bodies, if need be, directly annulling them ; but this is a consideration which belongs to the legislature, and not to the judges. Until it is done, I am clearly of opinion that we cannot look behind the law, as it is signed and deposited among the public archives. It has thus become a record which cannot be contradicted.

In the present state of the law, I am satisfied the attempt to investigate the manner in which laws have been enacted by our legislative bodies, would be attended by far greater evils than those we should be likely to remedy. How shall we proceed, and where shall we stop ? It is said, have recourse to the journals which certainly are required to be correctly kept, and are, for some purposes, evidence. The answer is, we have painful evidence before us, that they are far more likely to be erroneous than the enrolled bills ; and unfortunately there is no reason to hope that they will be much improved. It is said, also, examine witnesses and ascertain the truth, as you ascertain it in other cases. The answer is, the law has established a different mode of proof, and has provided no mode of establishing such facts. If it can be done, it must be, as was admitted on the argument, by each judge, and it would seem, also, each officer and individual, whose rights and duties are affected by the law in question, for himself in the best manner he can, and as, in fact, the defendants did ; and when this or any other court shall have pronounced this decision, no record can be made which shall embody the judgment and render it binding on other courts or persons. If such proceeding can be allowed in regard to a modern statute, it may be applied to those which have been long in force. The conclusion and uncertainty which would arise from such a course, would probably produce far greater evils than can arise from submitting for a time to a statute not constitutionally enacted. That such evils are rather imaginary than real, would seem to be shown by the fact that the amendments alleged to be omitted on the present occasion, although of beneficial, are not of vital

importance, and also by the fact that, during a legislation of nearly two hundred years, we have heard no complaint of a similar occurrence. In my opinion, the writs of *mandamus* must be awarded as prayed for.