[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 95 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 96 
These are appeals from judgments of the Division of Tax Appeals sustaining excise taxes imposed on the appellants for the years 1942 to 1946 inclusive. We will speak of one appellant as the "Lackawanna" and the other as the "Central". The taxes were levied pursuant to the Railway Tax Law of 1941, P.L. 1941,Ch. 291, Article III, as amended in minor details by P.L.
1942, Ch. 169; R.S. 54:29A-13 et seq. The controversy turns on the amount of railway operating income as defined in section 14, which we quote, directing attention especially to the terms "railway tax accruals", and "joint facility rents".
"For the purpose of this article, net railway operating income shall be computed as total railway operating revenues from all sources, including any revenue whatever derived directly or indirectly from property which is used for railroad purposes, less costs of railroad maintenance, operation, depreciation and amortization, railway tax accruals, uncollectible railway revenues, rentals (both debits and credits) for equipment leased for less than one year or interchanged, and joint facility rents (both debits and credits). Deductions from operating revenues for depreciation, additions and betterments, and compensation for personal services shall be subject to regulation by the commissioner, as to reasonableness of amount and appropriateness of accounting distribution."
Let us first consider the excise tax assessed against the Lackawanna for 1942. At the time the statute was approved, July 22, 1941, the Railroad Company was indebted to the State in the sum of $7,236,147 for property taxes assessed but unpaid for the years 1934 to 1940. Of this amount, only $1,240,886 appeared on the Company's books. Upon passage of the tax *Page 97 
statute, the Company entered in its books as a liability, under account 770, entitled Other Deferred Liabilities, the balance of these taxes, $5,995,261, but at the same time entered the same amount as an asset in account 727, Other Unadjusted Debits. Thus the Company's surplus account was not affected. The Company also began, as of May, 1941, transferring the tax debt from accounts 770 and 727 to income account 532, Railway Tax Accruals, at the rate of $100,000 a month, as a deduction from current income. During 1941, the Company thus charged operating income on account of the delinquent taxes, $800,000, in addition to taxes for the current year of $2,042,174. The Company's net railway operating income for 1941, as shown on its books of account and reported to the Interstate Commerce Commission, was $800,000 less than it would have been if the full amount of the taxes for 1934 to 1940 had been entered in Railway Tax Accruals from year to year as the taxes became payable, or if the Other Deferred Liability item of $5,995,261, written up in 1941, had been taken from surplus and not offset by a nominal asset.
The New Jersey Tax Commissioner assessed against the Company a franchise tax of $882,362 for 1942, based on the operating income for 1941, as shown in the Company's report to the Interstate Commerce Commission. But four years later, acting under the power granted by sections 25 and 27, the Commissioner reassessed the tax, increasing it by $223,359. He reached this increase by disallowing the item of $800,000 delinquent taxes as a deduction from operating income for 1941. The Company objects to this action of the Commissioner asserting a right, under the Railway Tax Law, to deduct the old tax debt from 1941 income.
As an aid in the construction of the Railroad Tax Law, counsel call to our attention the report of the Joint Legislative Committee that drafted the statute. The question thus arises whether we should give consideration to the report.
Chancellor Zabriskie, in Keyport Steamboat Co. v. FarmersTransportation Co., 18 N.J. Eq. 13, at 24 (1866), said that the intention of the draftsmen of an act, if not properly expressed in the act, has nothing to do with its construction. *Page 98 
"If the legislator who enacted the law should afterward be the judge who expounds it, his own intention which he had not skill to express, ought not to govern." This principle has been held to exclude consideration of the statement submitted with a bill by the individual member who introduces it, setting forth the objects proposed to be accomplished by its enactment. Raymond v.Teaneck, 118 N.J.L. 109 (E. A. 1936); Flagg v. Johansen,124 N.J.L. 456 (Sup.Ct. 1940). But see Winne v. Cassale,100 N.J.L. 291 (E. A. 1924). The legislative history of a statute, as disclosed by the journals of the Senate and House of Assembly, may be on a different level. The journals cannot be used indeed to prove that the statute deposited with the Secretary of State was never actually adopted, or was passed in different form. Pangborn v. Young, 32 N.J.L. 29 (Sup.Ct.
1866); State v. Underground Cable Co., 18 A. 580 (Bird,V.C.); affd. sub nom. Standard Underground Cable Co. v.Attorney General, 46 N.J. Eq. 270 (1889). And it has been said that such legislative history cannot be resorted to in aid of construction, but even when so saying, our courts have felt reassured when the history confirmed their interpretation of the law. In re Murphy, 23 N.J.L. 180 (Sup.Ct. 1851); AttorneyGeneral v. Cady, 84 N.J.L. 54 (Sup.Ct. 1913); In re HudsonCounty, 106 N.J.L. 62 (E. A. 1929). See also dictum inSooy ads. State, 38 N.J.L. 324 (Sup.Ct. 1876). On the other hand, our courts on occasion have frankly accepted as an aid to interpretation of a statute, the amendments to the bill which were adopted before final enactment of the measure. Masonv. Cranberry, 68 N.J.L. 149 (Sup.Ct. 1902); Maul v.Martin, 116 N.J. Eq. 479 (Buchanan, V.C., 1934); StateBoard v. Richman, 117 N.J. Eq. 296 (Sooy, V.C., 1934). And Vice Chancellor Emery, in Koch v. Koch, 79 N.J. Eq. 24
(1911), construing the divorce act, had resort to a special message of the governor, the report of commissioners from which the statute was partly drawn, and the minutes of the Assembly. From this review of our authorities, it appears to us doubtful whether or not the report of the Joint Committee on Railroad Taxation may properly be considered by us. *Page 99 
My colleagues, Judge Jacobs and Judge Eastwood, are satisfied that, if the authorities permit, we should avail ourselves of whatever help we can get from the report. They are impressed with the desirability of employing every aid to an accurate ascertainment of the legislative will. The decisions of the Federal courts and the courts of most of our sister states support their position. On the other side, I am persuaded that there are valid reasons for rejecting such material as the report of the Joint Legislative Committee and for holding that the meaning of a statute should be derived exclusively from the statute itself, read in the light of the pre-existing law, other statutes in pari materia and the situation that led to the enactment. The more we depart from that rule and resort to the proceedings of the legislature leading to the enactment, the more inaccessible the law becomes, even to lawyers. See remarks of Justice R.H. Jackson before the American Law Institute, printed in 34 A.B.A.J. 535 (1948). Since every one is presumed to know the law and is expected to obey it, basic public policy requires that the means of knowing the law should be widespread. In any event, my colleagues and I have reached the same conclusion with regard to the meaning of the Railway Tax Law.
In order to understand the formula contained in the Railway Tax Law for determining the amount of the excise tax, we must start with the uniform system of accounts for railroads which was developed under authority of Congress by the Interstate Commerce Commission many years ago, and still remains in effect, although it has been amended by the Commission from time to time. The New Jersey Public Utility Commission, pursuant to R.S. 48:2-16, has prescribed the same accounting system. All railroads in New Jersey and substantially all in the nation, for many years have kept their books in accordance with the system set forth in the regulations of the Interstate Commerce Commission.
When our Legislature in 1941 made "net railway operating income" the basis of the calculation of the excise tax, it meant an income derived by including such items and deducting such other items as the uniform system prescribed, subject *Page 100 
however to "regulation" by the Tax Commissioner of the deductions for depreciation, additions and betterments and personal services. The terms used in the definition of net railway income, which is contained in section 14 of our statute, have all of them acquired a rather precise meaning from their employment through the years in railroad accounting. Since the tax law expressly authorizes the Tax Commissioner "to regulate" certain items, the appellant argues that the principle expressio unius exclusioalterius forbids him from regulating any other items in the account, and concludes that he was without authority to consider the propriety of deducting the old taxes under the heading "Railway tax accruals". We cannot agree. The Commissioner had power to make such audit as might be necessary to satisfy himself of the amount of operating income. He must necessarily consider and decide whether the entries in the account, tax accruals, are accurately stated and properly belong there in accordance with the uniform system. It is impossible to devise accounting rules that will work automatically in all cases and leave no room for the accountant's individual judgment. In the event the taxpayer's accountant and the Commissioner disagree about certain entries in the calculation of net income, the Commissioner's judgment must prevail. We do not mean that he can overrule established usages and interpretations of the uniform system of accounting, but only that in a twilight zone his judgment governs, for upon him rests the duty of assessing the tax.
The Lackawanna's method of accounting for the 1932 to 1940 taxes was not in plain conformity with the uniform system of accounts or in accordance with any well settled custom. In fact, the examiner for the Interstate Commerce Commission took exception to it and that appellant then sought and obtained from the Commission special permission to enter the back taxes in the railway tax accrual account at the rate of $100,000 a month. We assume, of course, that such permission was in harmony with the purposes of regulation by the Commission, but it did not affect the amount of the appellant's excise tax. It remained well within the scope of the Tax Commissioner's power to consider whether or not, in calculating the *Page 101 
excise tax, the old property taxes were deductible from current operating income. Further, we are of the opinion that the Commissioner did err in his original levy when he permitted the deduction to be made and that later he correctly disallowed the deduction and amended the tax levy. This view is in accordance with the opinion of Justice Oliphant, speaking for the Court of Errors and Appeals in Norton v. State Board, 134 N.J.L. 57
(1945).
That case was much like the one now before us. The former Supreme Court decided that unpaid taxes assessed for the years 1933 to 1936 could be deducted as "tax accruals" from operating income for 1942 in computing the excise tax, and held that the date when tax liability is established, rather than the date when the assessment is made, determines the year in which the tax may be considered an accrual and deducted from operating income. But what the railroad company sought to deduct were taxes, the validity of which had been finally settled in April, 1941, and therefore, even on the formula adopted by the Supreme Court, these taxes could not be deducted from 1942 income. In the Court of Errors and Appeals, Justice Oliphant pointed this out and then went on to say: "Even so, in view of the importance of the question presented, we deem it advisable and necessary to determine it on its merits", and after careful consideration reached the conclusion that the term "tax accruals" in the Railway Tax Law means current taxes for the particular year in which the deduction is sought.
Since the judgment of the Court of Errors and Appeals would have been the same even had they approved the Supreme Court formula, the appellants argue that Justice Oliphant's discussion of tax accruals was unnecessary to the decision and does not establish the law conclusively as does a decision of our highest court. If that view of the Norton case is sound, we are under a duty to examine afresh the matters considered by Justice Oliphant. "Strictly speaking, the law of judicial decision cannot, in this manner, be evolved in advance by judges however exalted and learned. This is the appropriate method of legislation." Lister v. Lister, 86 N.J. Eq. 30, at 43(Stevenson, V.C., 1916). At the least, however, what was *Page 102 
written in Norton v. State Board is judicial dictum, that is, "An expression of opinion on a question directly involved, argued by counsel and deliberately passed on by the court, though not necessary to a decision." In this aspect, while not binding as a decision, it is entitled to great weight as the considered opinion of a group of able judges and should not be lightly disregarded. Crescent Ring Co. v. Travelers Indemnity Co.,102 N.J.L. 85 (E. A. 1925). But perhaps this is an instance in which the Court of Errors and Appeals had two grounds upon either of which it might have rested its judgment and it adopted both, so that each is the authoritative decision of the court and of equal authority with the other. U.S. v. Title Insurance etc.Co., 265 U.S. 472, 44 S.Ct. 621 (1924). To be on the safe side we have made an independent study of the statute and have come to the same conclusion that Justice Oliphant expressed.
The excise tax is based on that part or percentage of a carrier's net operating income which is taken to be applicable to New Jersey. That percentage is equal to its miles of track within New Jersey divided by its total miles of track. The exact percentage of the Lackawanna's trackage in New Jersey has varied a trifle from year to year. In 1941, the figure was 27.92%. Under the formula contained in the Railway Tax Law, every dollar deducted from that appellant's Railway Operating Income diminishes the excise tax by 27.92 cents. The deduction of $800,000 for back taxes claimed by the appellant in 1941, reduced its excise tax for 1942 by $223,359, that is to say, 27.92% of $800,000. Had it chosen to transfer $1,600,000 of the back taxes to the account, Railway Tax Accruals, in 1941, its excise tax would have been cut $446,718 instead of $223,359. Under appellant's theory of the law, it was able to determine the amount of its excise tax in this manner. If the Lackawanna had paid its property taxes promptly as they fell due from 1934 to 1940, or even if it had then accrued the taxes on its books, as did the Central, it would not have been able to reduce its excise tax at all. Delinquency is rewarded. If all the tracks of appellant had been located in New Jersey, the addition of $800,000 to Tax Accruals in 1941 would have *Page 103 
reduced the excise tax by $800,000. If, like the New York Central Railroad system, a very small percentage of its tracks had been in New Jersey, say 2%, the reduction would have been only $16,000. Inequality would be the rule. It is inconceivable to us that the Legislature intended that the amount of the excise tax would be dependent on such factors.
What we have said of the excise tax for 1942 applies equally to the taxes for 1943, 1944 and 1945 against the Lackawanna. But in 1945 and in 1946 new items appear which require mention. The Lackawanna paid in 1944 and 1945 large sums of interest on the property taxes for the years 1934 to 1940, and charged the same against operating income for 1944 and 1945 as Railway Tax Accruals. Customarily interest on taxes is entered in the uniform system of accounts under account 547, Interest on Unfunded Debt, and is not a factor in determining Net Railway Operating Income. It is "below the line". The appellant, however, obtained leave of the Interstate Commerce Commission to enter the interest in account 532, Railway Tax Accruals, on the theory that in New Jersey the "interest is a component part of the principal tax". This view of New Jersey legal philosophy is said to be based onWilentz v. Hendrickson, 133 N.J. Eq. 447; affd.135 N.J. Eq. 244 (1944). As we read that case, it decides nothing as to the nature of interest on railroad taxes, except that it is not a penalty or means of punishment, but is compensation for the State's loss of the use of the tax money for the time being, and that as it accrues from day to day, it is an asset of the State which the Legislature cannot give away. But whether or not interest is in some aspects a part of the tax is unimportant. The Tax Commissioner properly disallowed the deduction of interest because interest on taxes is not an operating expense.
Another deduction from operating income for 1945, claimed by both the Lackawanna and the Central, was disallowed by the Tax Commissioner. The Railway Tax Law of 1941, besides the excise tax, imposed a property tax on railroads beginning with the year 1941, in lieu of the property tax theretofore assessed underR.S. 54:19-1 et seq. The tax for 1941 under the new law was duly assessed against the appellants *Page 104 
and was promptly paid. Four years later, August 29, 1945, the former Supreme Court filed an opinion holding that the 1941 statute, insofar as it imposed a property tax for 1941 and relieved railroads of liability for the 1941 tax levied under the old law, was unconstitutional. Jersey City v. State Board,133 N.J.L. 202 (Sup.Ct. 1945). Forthwith, before judgment was entered pursuant to the opinion and before any demand or reassessment was made by the Tax Commissioner, the Lackawanna sent him a check for $530,902, being the difference between the amounts due for property tax for 1941, under the old law and under the new. At the same time, that appellant informed the Commissioner:
"It is the intention of The Delaware, Lackawanna and Western Railroad Company to appeal from said decision and judgment of the Supreme Court; and this payment is made without prejudice to the right of said Railroad Company to take such appeal or otherwise contest the legality and validity of said additional amount of principal of taxes, and upon the understanding and condition that if it shall be determined on such appeal or otherwise that said additional amount of principal of taxes shall not be legally or validly assessed or be due the State of New Jersey, then the amount of the payment made herewith shall be refunded or applied as a credit upon any future taxes which may become due and payable by said Railroad Company to the State of New Jersey."
The Trustees of the Central Railroad proceeded more cautiously. They awaited the entry of the judgment of the Supreme Court inJersey City v. State Board on October 16, 1945. It was thereby adjudged that the assessments for the year 1941 under the 1941 law were null and void, and further that the assessments of railroad property for the year 1941, made pursuant to the Revised Statutes of 1937, "are, and have been, since the making thereof, valid, lawful and subsisting obligations of the taxpayers assessed." On November 14, the Railroad Trustees petitioned the District Court of the United States for the instructions of the District Court in the premises and for authority to pay the unpaid balance of the 1941 tax as originally levied, together with interest thereon. The same day the District Court made its order "that the Trustees of the debtor be and they are hereby authorized and directed to pay to the State of New Jersey the unpaid balances of the 1941 tax assessments *Page 105 
as originally levied" together with interest, "without prejudice, however, to the petitioner's right under the provisions of section 49 of chapter 291 of the Laws of New Jersey of 1941, to have credited said principal and interest on account of any future taxes that may be due to the State of New Jersey, or their right to other redress in the event the Court of Errors and Appeals reverses said decision and rule for judgment." The following day the Trustees sent to the State Tax Commissioner their check for $1,645,494, the balance of the 1941 taxes as originally assessed, and the interest thereon. With the check, they enclosed a copy of the order of the District Court. The Tax Commissioner placed the money received from the Lackawanna and from the Central (as well as the similar payments from other railroad companies) in a special account awaiting the decision of the Court of Errors and Appeals. Perhaps I should mention that the appellants had nothing to do with this disposition of the money.
The appeal from the judgment in Jersey City v. State Board
was promptly taken and the Court of Errors and Appeals reversed the Supreme Court May 3, 1946. Jersey City v. Kelly,134 N.J.L. 241 (E. A. 1946). Thereupon, the Commissioner refunded the sum of $530,902 to the Lackawanna and credited the money received from the Central on account of future taxes, in accordance with the order of the District Court. Later, July 11, 1946, the Commissioner assessed the franchise excise taxes against appellants for 1946, which were based on railway operating income for 1945. We may assume arguendo that the Commissioner in his calculation might have deducted the sums paid him from operating income for 1945 and added the same amounts to operating income for 1946, and so reached lower excise taxes for one year and higher taxes for the following. But he did not do so; he declined to allow as operating expenses for 1945 the sums which had been deposited with him and which he had returned or credited. In our opinion, he was fully justified in doing so. The appellants were fully aware when they made the payments that the litigation over the 1941 property taxes was not yet concluded; the payments were tentative. Before the excise taxes were levied, the Court of *Page 106 
Errors and Appeals had established that the amounts now under discussion were never, in law, payable to the State.
One other question arises on the appeal of the Central. The Central and the Pennsylvania Railroad Company each owns one-half of the capital stock of the New York and Long Branch Railroad Company. The first two companies jointly use the line and facilities of the Long Branch and each pays as rent one-half of certain charges, including taxes and other governmental charges levied against the Long Branch. In August, 1945, the Trustees of the Central, by authority of the United States District Court, paid to the Long Branch $179,833 on account of interest on taxes assessed against the latter for the years 1934 to 1940. The payment was entered in the books of the Central in account 541, Joint Facility Rents. The Tax Commissioner ruled that the payment was not deductible from Railway Operating Income. Counsel for the Central very briefly argues that this was error.
The Long Branch Railroad, to the extent of 50%, is treated as an integral part of the Central Railroad system in the levying of the excise tax, and we understand that 50% of the taxes paid or accrued by the Long Branch is deducted in ascertaining the Railway Operating Income of the Central Railroad system. If payments by the Central to the Long Branch were also deductible, the same items would be in effect deducted twice. On the record before us, we cannot say that the Tax Commissioner erred.
 The judgments of the Division of Tax Appeals are affirmed. *Page 107