6 N.J. Super. 285 (1950)
71 A.2d 208
IN THE MATTER OF THE APPEALS OF PORT MURRAY DAIRY COMPANY, AND OTHERS.
Superior Court of New Jersey, Appellate Division.
Argued December 19, 1949.
Decided February 3, 1950.
*290 Before Judges JACOBS, DONGES and BIGELOW.
Mr. Herbert J. Hannoch, Mr. George B. Bailey, and Mr. Morris Duane (of the Pennsylvania Bar), argued for the appellants (Messrs. Hannoch & Lasser, Bailey & Schenck, and Katzenbach, Gildea & Rudner, attorneys).
Mr. Joseph Lanigan, Deputy Attorney General, argued for the respondent Director, Office of Milk Industry (Mr. Theodore D. Parsons, Attorney General).
Mr. Louis P. Dolan argued for the intervenor United Milk Producers of New Jersey (Messrs. Dolan & Dolan, attorneys).
The opinion of the court was delivered by BIGELOW, J.A.D.
This case and Como Farms v. Foran, 6 N.J. Super. 306, both of which are concerned with State regulation of the milk industry, were argued together. The opinion of Judge Jacobs in the Como Farms case affirms the constitutionality of the Milk Control Act of 1941 and the Department of Agriculture Act of 1948. The present opinion considers certain actions of the Director of the Office of Milk Industry. From 1933 until 1949, milk sales at all levels of the industry were subject to minimum prices fixed by the Director. But toward the end of the period, considerable dissatisfaction arose among the consumers of milk because the retail price in New Jersey was two or three cents higher a quart than in neighboring states. On December 28, 1948, the Director issued an order effective January 1, 1949, in which *291 he recited that the Governor desired, as an experiment, that all resale pricing of milk be eliminated for an indefinite period. The order continued:
"Under the authority granted me by the law I am hereby suspending all minimum prices to be charged by dealers to consumers, dealers to stores, stores to consumers, processors to sub-dealers, processors and dealers to other processors and milk dealers for all milk and cream in the marketing areas of the State of New Jersey."
This is the first action that is under attack. It left in effect the minimum prices governing sales by dairy farmers to processors or others. By order dated March 17, 1949, the minimum price to be paid to producers for Class I milk was reduced from $5.60 per hundredweight to $5.15. That order is not attacked. I should mention that the term "Class I milk" has no reference to the quality of the milk but only to the purpose for which the milk is to be used. It is milk that is marketed to the consumer as fluid milk, while Class II milk is that which is used for making cheese, ice cream, butter, etc.; it is the dairyman's surplus that he is unable to sell as Class I milk, and for which he receives a price much lower than for Class I. This litigation relates directly only to Class I milk.
Always more milk is produced in May and June than in other times of the year; the June average is about 30% above November. But due to fine pasturage and other conditions in the spring of 1949, the June production rose to 50% in excess of the preceding November, and of course prices tended to fall. During the winter, retail milk prices in this part of the country had already declined about two cents a quart, but while the New Jersey price declined, it still remained higher than the price in New York and Pennsylvania. On May 23rd, one of the three largest milk dealers in the State announced a reduction of three cents per quart in the retail price. That company bought almost all of its milk outside of New Jersey at a figure that was much less than the New Jersey producers' price set by the Director, even after the reduction permitted by the order of March 17th. Other *292 dealers, to preserve their competitive position, lowered their retail prices and looked around outside of the State for a cheaper supply of milk. The dairyman's milk is usually disposed of under an annual contract that is subject to cancellation on two weeks' notice. At the end of May, 1949, a few farmers received notices of the cancellation of their contracts, and a general feeling of uncertainty developed among the producers. The Director responded to the situation by calling a public meeting to be held on June 6th. After the hearing, on June 24th, the Director issued six orders and regulations which he hoped might meet the situation. These, together with the order of December 28, 1948, are the subject of the appeal. The first of the orders of June 24th, No. 49-5, abolished a sub-classification, namely Class II-a, that the Director had established a few months earlier. Order 49-6 fixed the minimum price of Class I milk at $5.45, that is, 30 cents above the price set the preceding March. Regulations 13 and 17 set up the norm and excess plan. Regulation 15 requires that prices be posted monthly. Regulation 16 deals with milk from outside the State.
Appellants attack Order 48-8 suspending minimum prices because of the recital of the wishes of the Governor, the absence of findings of fact, and the lack of a hearing upon notice before the order was made. Under our present Constitution, the Governor has a more active and responsible role as chief executive than under our former constitutions. Every principal department of the government is "under the supervision of the Governor." Article V, Section IV, paragraph 2. Although the Director is not the head of one of the principal departments, yet it was entirely proper for him to consult with the Governor and to obtain his views and advice. Of course, ultimate responsibility for making the order rests on the Director himself, and we must assume, in the absence of proof to the contrary, that the Director did not surrender his judgment but became convinced that the course which the Governor recommended was the wise one. His decision to adopt that course was not unlawful, arbitrary or beyond the scope of his discretion.
*293 The statute R.S. 4:12A-1 et seq. contains several provisions relating to findings of fact. Section 22 provides, "The Director may ascertain, determine and may fix or refix by investigation and proof, as the emergency permits, the minimum prices to be paid," etc. Section 23 reads:
"Before fixing or refixing any price, the director shall give a notice by public advertisement inserted in at least three daily newspapers of this State that he is considering the fixing or refixing of such price and that a public hearing will be held thereon on the day, time and place set forth in such notice, which day shall not be less than five days after the day of insertion. After such public hearing, if the director fixes or refixes any price, such fixed or refixed price shall be effective upon the fifteenth day after such rule or order fixing or refixing the price and the findings of fact upon which it is based have been filed in the office of the Secretary of State."
A decision not to fix prices or the repeal or suspension of price-fixing regulations and orders is not a fixing of prices and does not come within the operation of Sections 22 or 23.
Section 20 gives the Director authority to "adopt, promulgate and enforce all rules, regulations and orders necessary to carry out the provisions of this act. An order applying only to a person named therein shall be served," etc. * * * "All orders and determinations of the Director shall include the findings of fact upon which such orders or determinations are based." Evidently the Legislature did not use the word "orders" as synonymous with rules and regulations, and did not intend to require findings of fact to support the rules and regulations. Although it is difficult to draw the dividing line, rules and regulations may be said to comprise those actions of the Director in which the legislative element predominates, which establish a pattern thereafter to be followed in a certain group of matters. Orders and determinations are actions in which there is more of the judicial function,  which deal with a particular, present situation. In the absence of a statutory requirement, an administrative agency generally need not grant a hearing or make findings to support the regulations that it adopts. Pacific States Box & Basket Co. v. White, 296 U.S. 176; 56 S.Ct. 159; 101 A.L.R. 853 (1935). While the action of the Director, which is under consideration, *294 is entitled Determination of Fact and Order No. 48-8, it is, in fact, a repealer, or suspension for an indefinite period, of certain regulations; it was an exercise of the Director's legislative function. Furthermore, it only puts into effect the Director's decision no longer to employ his power over prices, except on sales by producers. No findings of fact were required as the basis of the action.
The appellants, who are processors or milk dealers and not producers, object on sundry grounds to Order 49-6 that increased the minimum price of Class I milk to $5.45 per hundredweight. First that the notice of the hearing was insufficient to make the parties in interest aware that orders and regulations of the type appealed from were under consideration. The notice called a hearing to consider "measures to be taken to stabilize and assure orderly marketing," "proposals to effectuate a more level production of milk in this State," "prices to be paid to producers for Class I milk and Class II milk and the prices for sales of milk and cream by and between all persons in respect to whom, by law, the price may be regulated." Testimony was requested as to costs of production, processing and distribution and as to available supplies and demand. The notice did not indicate at all the actions contemplated by the Director and so did not give interested parties proposals that they might criticize or support with proofs and argument. But we may assume that the Director had no plan in mind when he called the hearing; he looked to the hearing for guidance in meeting the situation caused by the reduction in the retail price of milk. The notice did, however, state comprehensively the several subjects on which the Director sought enlightenment. In our opinion, the notice was sufficient. Tagg Bros. & Moorhead v. U.S., 280 U.S. 420, 50 S.Ct. 220 (1930). We think that Morgan v. U.S., 304 U.S. 1, 58 S.Ct. 773 (1937), does not apply. It was in that case that the Supreme Court held that "Those who are brought into contest with the Government in a quasi-judicial proceeding aimed at the control of their activities, are entitled to be fairly advised of what the Government proposes and to be heard upon its proposals before it issues its *295 final command." There the Secretary of Agriculture ordered an inquiry with respect to the reasonableness of the charges of the market agencies at the Kansas City Stockyards, found them unreasonable and prescribed lower maximum charges to be observed in the future. "The proceeding had all the essential elements of contested litigation." By contrast, the hearing in the matter now before us was a typical legislative hearing and not quasi-judicial. Norwegian Nitrogen Products Co. v. U.S., 288 U.S. 294, 53 S.Ct. 350 (1933).
At the time of the hearing, the Director was sick and unable to attend. The Deputy Director conducted the hearing and afterwards submitted a report thereon to the Director, together with a stenographic transcript of the evidence, and the Director himself then took the action of which complaint is now made. These circumstances make another ground for appeal.
The statute of 1941, R.S. 4:12A-4, expressly authorizes the appointment of a deputy director but does not define his duties or authority. The word deputy, whether used as a noun or adjective, has, however, a well-known meaning. A deputy is one appointed to act for another or in another's right, and who is usually invested with the powers and authority of his principal. Willis v. Melvin, 53 Mo. Car. 62 (1860); Saxby v. Soonemann, 149 N.E. 526 (Ill. 1925); Byrnes v. Windels, 193 N.E. 248 (N.Y. 1934); State v. Guckenberger, 3 N.E. 2d 502 (Ohio 1936). The Legislature's choice of the term deputy director gives by implication to the director power to conduct the hearing through the agency of his deputy. The order, as we have noted, was made by the Director himself. Not even in a strictly judicial proceeding is it essential that the testimony be taken before the same officer who makes the decision. Among the many examples that come to mind are the trials in the County Court on evidence taken in the Labor Department in Workmen's Compensation cases, and in the old days hearings in Chancery on testimony taken by examiners and hearings in certiorari on depositions. And the rule of administrative agencies is the same. Eastland v. Federal Com. Com., 92 F.2d 467 (1937); *296 Willapoint Oysters v. Ewing, 174 P.2d 676 (1949). No invalidity attaches to the action of the Director because the hearings were held by his deputy.
The appellants also argue that the evidence presented at the hearing did not support the findings of the Director, and that he was influenced by facts or alleged facts that were not proved at the hearing. The Director, after referring to his earlier order, March 17, 1949, that reduced the price to $5.15, found,
"As stated in that order, there had been little net change in producers' costs, but the quantitative factor of the spring flush of milk together with the competitive factor of large surplus supplies at low prices made it mandatory that the price be reduced in order that the market of the New Jersey producer be maintained. My original estimates about milk production have been realized. During May an all time peak was reached, considerably above the milk production of the year previous. However, conditions have been rapidly changing. There has been no rainfall in the State of New Jersey since the latter part of May. Pastures are fast drying up with the consequent accelerated decline in milk production. In view of these facts, I have decided to increase the price to be paid to producers of milk thirty cents per hundredweight, effective July 9, 1949."
The evidence did show that the anticipated surplus of milk in the spring had occurred. While there was no proof as to rainfall or the drying up of pastures, or that the seasonal decline in milk production had been accelerated in consequence, the Director could take notice of the weather conditions between the latter part of May and the date of the order. June 24th, and from his own experience could deduce what the effect would be on production. Cf. Ohio Bell Tel. Co. v. Pub. Utilities Com., 301 U.S. 292, 57 S.Ct. 724 (1937), and Ward's Case, 190 N.E. 25 (Mass. 1934). But do the facts recited in the order form a reasonable basis for the increase of the minimum price of milk?
The statute requires that the Director set forth "the findings of fact upon which it (the price-fixing order) is based." Could a reasonable man, competent to fill the office of Director and familiar with the broad outlines of the milk industry, have been moved by the facts found to increase the minimum *297 price of milk as a step toward attaining the purpose which is stated in the statute? The appellants do not question the amount of the increase; but they argue that the findings cannot be a basis for any action at all. The findings are regrettably meagre, but we consider them sufficient to uphold the order. One legislative purpose is the securing of "a sufficient quantity of fresh, pure and wholesome milk to the inhabitants of this State." Section 22. The minimum price had been reduced in March, not because the producers' costs had fallen and they were making an unreasonably high profit, but because the reduction was necessary in order to hold the New Jersey market in competition with a large surplus supply offered at low prices. In June the situation was changing; it appeared that there would be a decline in milk production and competition would not be so keen. Hence it seemed possible to restore part of the cut without losing the market and the Director considered it wise to do so in order to encourage the New Jersey dairymen to produce that sufficient quantity of milk that is the object of the legislation.
Regulation 13 prescribes a "norm and excess plan."
"All licensed dealers and processors in this State who buy milk from producers shall set up a norm and excess plan of purchase as a basis for buying milk from producers.
"The establishment of norms must be undertaken by the producers, or a producers' committee representing all the producers, and the dealer to whom the producers are selling milk. To facilitate these negotiations, each dealer shall call a meeting of his producers before the close of the calendar year to the end that a producers' committee may be chosen, if one is not already functioning, and arrangements made by the dealer to meet with the producers or producers' committee for the development of a production equalization and marketing program to be filed with the Director on or before January 15, following, which agreement will be analyzed, and if it is equitable and prepared in accordance with instructions hereinafter outlined, it will receive the Director's approval.
"Where producers' norms have been fixed by agreement between the dealers and the producers or producers' committees and approved by the Director, these norms shall prevail for the calendar year commencing January 1, and until further order of the Director. Agreements between producers and dealers relating to norms entered into subsequent to January 1, and approved by the Director may be used after such approval as of the effective date.
*298 "In all cases in which no agreements between producers and their dealers relating to norms have been entered into and approved by the Director on or before February 15th, the producer's monthly norm shall be fixed for the calendar year commencing January 1, by adding his entire deliveries of milk to a dealer for the months of January, February, March, April, July, August, September, October, November, and December, and dividing the total thereof by ten.
"Where it appears that producers' herds have been depleted by tests or his production has been adversely affected by other causes beyond his control, the Director may in his discretion make such adjustments in the norm as appear to be equitable. No requests for such adjustments will be considered by the Director unless same have been submitted to an acted upon by the producers' committee under whose jurisdiction the producer is shipping.
"Where the production of milk delivered by a producer to a dealer or processor does not vary more than 10% between the months of May and November in any calendar year, he shall be paid the Class I price for all norm milk received by the dealer or processor from this producer as long as his production does not vary more than 10% above his November production.
"If the purchase of milk in accordance with the above norm and excess plan is not feasible or works a hardship on a licensed dealer or processor, application may be made by the licensed dealer or processor to the Director of the Office of Milk Industry for relief. Any licensed dealer or processor who pays the Class I price for all milk received from producers shall be exempted from the terms of this regulation."
The object of this regulation is to induce dairy farmers to stabilize milk production and to combat the natural tendency of herds to yield much more milk in the spring than in the fall. It is not an altogether new plan but is akin to plans used in New Jersey for half a dozen years on a voluntary basis, and then dropped during the war when the Federal Government asked that great efforts be made to increase milk production.
A primary milk dealer usually takes, let us say, the output of 50 farmers. Under the plan of Regulation 13, the farmers choose a producers' committee who bargain collectively with the dealer. He has facilities for handling so many hundredweight of Class I milk and agrees with the committee to buy that much during the ensuing year. The committee allocates the milk, so much to each farmer, and that is his norm for the year. The dealer becomes obligated to take at Class I *299 prices all the norm milk, except that he need not take in May or in any month more than 10% above the preceding November production. Above that, he need not buy, or if he does, he buys at the Class II price. We will suppose that a certain farmer produces in the year just his norm of 2,000 cwt.; that he produces 162 cwt. in November and no more than 178 cwt. in June or in any other month. He sells the whole year's output to the dealer at the Class I price. But if his November yield is 144 cwt. and rises to 200 cwt. in the spring months, he may have in the course of the year 100 cwt. or more that he must dispose of as best he can as Class II milk.
The essence of the regulation is that it is mandatory. The dealer must come to terms with his producers, or accept the norms calculated according to paragraph 4, or go out of business. He becomes obligated for a full year,  perhaps longer. No longer is he protected by a two-weeks' cancellation clause. If a strike prevents operations, if his plant burns down, if his market dwindles under the competition of milk from New York and Pennsylvania, he must still take at Class I prices the norm milk of all his producers, or his license to do business may be subject to revocation and he may be liable for damages for breach of contract. If the dealer dies, his personal representative may be liable. The parties do not know what will be the price for the milk that is the subject of their contract, for it is the price set from time to time by the Director. We say that the obligation may run for longer than a year because paragraph 3 ordains "These norms shall prevail for the calendar year commencing January 1st, and until further order of the Director."
Appellants attack the regulation on the ground that it is too uncertain to be valid. For example, in our summary of its provisions, we said that the dealer is not obligated to take in any month more milk than 10% above what he took the preceding November. But appellants point out that paragraph 6 of the regulation speaks of a variation of not more than 10% "between the months of May and November in any calendar year." Again, from paragraph 4 it seems that the norm for each month (except May or June) is the ten-months' *300 average, while paragraph 6 indicates that the monthly norm is 110% of November. Another element of uncertainty complained of comes from the large measure of control that the Director reserves to himself. Thus the agreement between dealer and producers seems to be subject to the Director's approval. And he may make adjustments in the norm when the farmer's production is affected adversely by causes beyond his control. Inferentially, the producer's committee has a like power. The Director may also give relief to the dealer.
Legislative action is seldom held void for uncertainty and only as a last resort. A statute may present very difficult problems of interpretation; particular words or clauses may have to be ignored, but the intention of the Legislature as expressed in the statute will be given effect if the intention can be found with reasonable assurance. Abruzzese v. Oestrich, 138 N.J. Eq. 33 (Ch. 1946). Generally, the same rules that apply to the interpretation of statutes govern when the meaning and effect of rules or regulations of administrative agencies are the subject of inquiry. State v. Atlantic, etc., Ry. Co., 47 So. 969, 32 L.R.A. (N.S.) 639, 670 (Fla. 1908); California Drive-In, etc., Asso. v. Clark, 140 P.2d 657, 147 A.L.R. 1028 (Cal. 1943). Uncertain as Regulation 13 undoubtedly is, we do not find it void on that account. A more fundamental problem is posed by the query whether the regulation is within the authority granted to the Director by the Legislature.
The Director relies on the general language of the statute, § 20, giving him power to make "regulations to carry out the objects and provisions of this act." The preamble of the statute avers that the enactment was necessary for the "preservation of the public peace, to preserve, protect and promote the public welfare, health and safety;" "that it is made necessary by the conditions of unfair, unjust, destructive and demoralizing practices, heretofore existing or threatened, and presently threatening, in the production, sale and distribution of milk;" that it is the policy of this act to prevent these practices "by providing a reasonable return for the milk producer, *301 so as to prevent possible curtailment of a sufficient supply of fresh, wholesome, sanitary milk for our citizens."
The Director also points to § 21 authorizing the Director to "establish and require observance of fair trade practices" and to regulate the milk industry in every way "necessary to control or prevent unfair, unjust, destructive or demoralizing practices which are likely to result in the demoralization of agricultural interest in this State engaged in the production of milk or interfere with the maintenance of a fresh, wholesome supply of sanitary milk for the consumers of this State."
Scrutiny of these provisions discloses that the statute is aimed at practices characterized as "unfair, unjust, destructive and demoralizing" and suggests that the regulations, to be valid, must be designed to control or prevent such practices, or to accomplish affirmatively the complement thereof, that is, to establish and enforce "fair trade practices," or perhaps in some other way to increase the return or gross receipts of the dairyman.
An administrative agency, such as the Milk Control Office, is purely a creature of legislation. It has no powers except those given by statute. Formerly such statutory grants were strictly construed and it was held that the agency had no powers except those expressly conferred. Passaic Cons. Water Co. v. Board of Public Utility Com., 5 N.J. Misc. 1078; affirmed, 104 N.J.L. 666 (1928). See also Sutherland Statutory Cons., §§ 6603 and 6604, and cases therein cited. But nowadays, in the interpretation of all classes of statutes, a greater emphasis than formerly is put on the legislative intent, to be sought in the statute as a whole. Singer Sewing Machine Co. v. N.J. Unemployment Comp. Com., 128 N.J.L. 611; affirmed, 130 Id. 173 (1943); Morton v. State Board, 134 N.J.L. 57 (E. & A. 1945); Maritime Petroleum Products v. Jersey City, 1 N.J. 287 (1949). It is this eagerness to find and effectuate the intention of the Legislature that has led courts to use legislative reports and other extrinsic aids to construction. Del., L. & W.R.R. v. Division of Tax Appeals, 2 N.J. Super. 93 (App. Div. 1949). This careful attention to the policy of the legislation leads *302 to a more liberal construction of the powers of administrative agencies. Yet it remains true that the agency will not be considered to have power to curtail drastically important rights of the citizen, whether as regards person or property, unless the legislative intention to grant such power is plainly manifest. Wilentz v. Crown Laundry Service, 116 N.J. Eq. 40 (Ch. 1934); State v. Packard Bamberger & Co., 123 N.J.L. 95 (Sup. Ct. 1939). See also Schwartz v. King, etc., Co., 93 N.J.L. 111 (Sup. Ct. 1919), and Maxwell, Int. of Statutes (Ed. 1937) 249. This is an application of the old canon that statutes in derogation of common right are strictly construed. The more vital the right and the more drastic the encroachment, the plainer must be the legislative intent. Our Legislature, in framing the Milk Control Act, recognized this principle and employed clear, positive language to vest in the Director power to fix prices. A regulation requiring a milk dealer to contract in advance for his entire supply of milk for the period of a year, is as great, or almost as great, an interference with what is normally a primary right of a business man, as is a regulation establishing the minimum price that he must pay. Such a contract, in the case of an average creamery, may run into four or five hundred thousand dollars. The statute grants to the Director no express authority to require milk dealers to make long term contracts for their milk, or to impose a "norm and excess plan." The regulation does not seem to be directed at the control or prevention of any practice, that might aptly be described as unfair, unjust, destructive or demoralizing. What the Director seeks to accomplish is to counteract the natural tendency of the dairy herd to produce more milk in the spring than in the fall, so that there will not be such a surplus of milk in the spring. Admirable as that object may be, we cannot find in the statute authority for the drastic measure that the Director selected to accomplish it. We therefore must hold Regulation 13 to be outside the scope of the Director's power and void.
Regulation 15 requires every licensed dealer, processor and retail storekeeper to post price lists showing all the *303 prices at which they will sell milk or milk products during the succeeding month. The retail store price list must be posted by the last day of the month; the other price lists by the 26th day of the month.
The Deputy Director, explaining this regulation, said that the "whole intent behind this" was to prevent dealers from making, on a short notice, a drastic reduction in the price of milk. The appellants are afraid, however, that the rule would not operate that way. If, at the last moment for posting a price  the 26th day of the month  an important dealer announces a price reduction for the next month, his competitors will be unable to meet his price for a whole month, and may lose a substantial part of their trade as a result. Asked about this aspect of the matter, the Deputy Director could only say, "I'd like to see the regulation tried to see whether that would happen or not. I haven't any experience on it." Director's counsel, in his argument, ignores this attack on the regulation. In the case of a last-minute reduction, the inability of other dealers to post similar reductions will tend to prevent the panicky atmosphere that followed the lowering of prices May 23, 1949. The regulation requires at least five days' notice of an intended reduction in the price, a sufficient time, perhaps, for the Director to assess the situation and determine whether action by him is called for. The requirement that retail stores keep prices in effect for a month, tends to prevent the use of milk as a "loss leader,"  a practice that the Director deems harmful. On the whole, we find Regulation 15 not unreasonable and hold it to be valid.
Regulation 16 relates to interstate commerce:
"Before a licensee of the Office of Milk Industry shall sell in this State any milk purchased from any person outside of the State of New Jersey, he must first file with the Office of Milk Industry, a certified report on forms provided by the Office of Milk Industry, setting forth the amount of milk purchased, the name of the vendor, the number of the permit issued by the Department of Health of the State of New Jersey to such vendor, and a certificate by the vendor of the sources of supply of this milk."
Total New Jersey milk production in the year ended May, 1949, was about 10,130,000 cwt., of which a substantial part was exported. In return, milk imports from our neighboring *304 states were 7,759,000 cwt., or over half of the total New Jersey consumption, 13,980,000 cwt. The fear that milk imports will increase is the nightmare of the New Jersey dairy farmer. We are told  with what accuracy we know not  that land values, taxes, farm labor costs, are all higher in New Jersey than in New York and Pennsylvania; that the New Jersey farmer must get a higher price than do his neighbors, if he is to continue in the dairy business. The New Jersey milk authorities have habitually fixed the price to the New Jersey producer considerably higher than the prevailing price in nearby states. The problem has been how to maintain the differential without attracting more milk from beyond our borders. New Jersey cannot erect a tariff wall to protect the home market.
The appellants argue that Regulation 16 is intended to hinder the interstate movement of milk into New Jersey, or if not so intended, it does, in fact, discriminate against interstate commerce. The respondent says that it is a sanitary regulation intended to protect the health of the people of the State.
Our Dairy Products Law, R.S. 24:10-1, etc., is outside the sphere of the Director of the Milk Industry; it is enforced by the State Department of Health, P.L. 1947, c. 177, § 37. All milk used in New Jersey, whether produced in New Jersey, or outside of the State, and all dairies and milk plants where the milk is produced, handled or processed, are subject to inspection by the Health Department, and must meet detailed standards prescribed by the statute. R.S. 24:10-11, 15 and 16. The creamery or other establishment where the milk is collected from the dairies, must have a permit issued by our New Jersey Department and, from the collecting point onward, every container must bear the permit number. §§ 2 and 7. Such in brief are the measures devised by the Legislature to guard against the dangers from polluted milk.
Conversely, the Milk Control Act of 1941, § 21, expressly states that it shall not "be construed as authorizing the Director to adopt, promulgate or enforce orders, rules or regulations, containing provisions or sanitary regulations as defined *305 in section one of this act." Section one defines sanitary regulations as all laws, etc., "relating to the production, handling, transportation, distribution and sale of milk from a health basis." If Regulation 16 is indeed a health measure, it is beyond the powers of the Director.
Viewed as an economic measure intended to protect the New Jersey dairy farmer against the competition of farmers in other states of the Union, it offends the Federal Constitution. Baldwin v. Seelig, Inc., 294 U.S. 511, 55 S.Ct. 497 (1935); H.P. Hood & Sons v. Du Mond, 336 U.S. 525, 69 S.Ct. 657 (1949).
Almost all the milk used in New Jersey is marketed to the consumer as a liquid. It must be handled with maximum celerity or it may spoil. Compliance with Regulation 16 is apt to delay the handling of milk from outside the State to an extent that may seriously jeopardize the competitive standing of dairymen and dealers beyond our borders. Let us suppose a distributor in Atlantic City,  where population and milk consumption vary greatly with the season and with the weather. On a Thursday the forecast is a fair weekend, so he applies to a broker for two tank trucks of milk. The broker is in touch with two creameries, one in Hunterdon County, New Jersey, and the other across the Delaware, in Bucks County, Pennsylvania. Each creamery is supplied by about 50 producers, whose facilities are inspected and approved by the New Jersey Department of Health, and both creameries are licensed by that Department. The milk from Hunterdon County, on reaching Atlantic City, is immediately put through the bottling plant and started on its way to the consumers. But the Pennsylvania milk cannot be sold until the distributor receives from the creamery in Bucks County a certificate of the sources of supply, that is, a list of the farmers who produced the milk, and not until the distributor files in Trenton the certificate and certain other information.
We find that Regulation 16 is void.
Regulation 17 is an adjunct of the norm plan prescribed by Regulation 13 and falls with that Regulation.
Judgment may be entered in accordance with the foregoing opinion.