THE KEYPORT AND MIDDLETOWN POINT STEAMBOAT COMPANY *vs.* THE FARMERS TRANSPORTATION COMPANY OF KEYPORT, AND JOEL GRIFFIN.[*]

1. Under the act to incorporate "the Keyport Dock Company," (*Pamph. L.* 1851, *p.* 25,) "the dock or wharf now owned by the said company" must be construed to mean now owned by the individuals composing said company.

2. By that act an adjoining shore owner is not deprived of the privilege, obtained by charter or license, of wharfing out in front of his own lands, even if it prevents vessels from landing at the side of the complainants' wharf.

4. The exclusive right of the shore owner, as supposed to exist before the wharf act of 1851, and as confirmed or conferred by that act, is to the shore and lands under water *in front* of him, giving the same right to the adjoining shore owner, and *ex necessitate* excluding him from acquiring any right taking away the right of the adjoining shore owner.

---

[*] CITED *in Stevens* v. *Pat. and New. R. R. Co.*, 5 *C. E. Gr.* 135; *Hoboken L. and I. Co.* v. *Hoboken*, 7 *Vr.* 551.

Keyport Steamboat Co. *v.* Farmers Transportation Co.

4. The act to incorporate the Keyport Dock Company cannot be construed, by mere implication, to take away the rights of the adjoining shore owner to the water in front of him; and the power to enlarge and extend the wharf, though given by express words, must be construed so as to authorize such extension in front of lands of the company only.

5. An act incorporating a company *for the purpose* of constructing a railroad from L. to M., with no further grant of franchises, would not confer the power of taking lands by the right of eminent domain, or even grant the lands owned by the state that might be crossed by the route.

6. The question, whether in New Jersey the legislature has power to grant to a stranger the right to cut off a shore owner from access, and other advantages of adjacency, to the water directly in front of his shore along tide waters, is an open one, so far as any question is to be considered open upon which there is no direct judicial decision.

7. It would seem that in the decisions of *Gough* v. *Bell*, the Supreme Court and the Court of Errors were of opinion that the shore owner has vested rights in the waters in front of him that cannot be taken away by the state.

8. The only just rule of construction of a law, especially among a free people, is the meaning of the law as expressed to those to whom it is prescribed, and who are to be governed by it.

9. If the legislator who enacted the law should afterwards be the judge who expounds it, his own intention which he had not skill to express, ought not to govern. But circumstances known to all the public, such as what the law was at the time, or what it was supposed to be, are proper to be considered in looking for the intention of the legislature when not explicitly expressed.

10. Under the act of March 13th, 1866, (*Pamph. L.* 345,) and the deeds by which they claim title, the Farmers Transportation Company of Keyport have the right to erect a wharf as proposed by them, so as that it does not obstruct the navigation of the bay, or affect the rights of the Keyport and Middletown Steamboat Company, or other private rights.

Upon filing the bill, a rule to show cause was granted why an injunction should not issue, and a temporary injunction granted meanwhile. The cause is now heard upon the argument of the rule, upon bill, answer, and affidavits.

*Mr. H. S. Little* and *Mr. Browning,* for complaniants.

*Mr. J. Parker* and *Mr. C. Parker,* for defendants.

Keyport Steamboat Co. *v.* Farmers Transportation Co.

THE CHANCELLOR.

This is an application for an injunction, on a bill filed for that purpose. The complainants own a wharf on the south side of Raritan bay and of the channel of the Matawan creek, where the same enters the bay. The wharf is known as the Keyport dock. It has existed as it now is, except an immaterial addition at the west side, for fifteen years. It has a front of about one hundred and fifty-five feet, and extends out into the channel in front of it to where the water is four or five feet deep at low tide, and navigable for the boats usually employed in the trade from that place to New York, for which trade it has been used for nearly twenty years. The steamboats used by the complainants in their business are two hundred and forty feet long, and fifty-three feet beam, and can lay on the east side of the wharf; they are usually brought to in front of the wharf, where they discharge and receive their passengers and freight, by running the bow for more than half the length of the boat, along the east side of the wharf, throwing out a line, and by it backing or rounding the boat to the front of the wharf in position to discharge and receive passengers and freight, and to start on the next trip, with the least trouble and delay.

The defendants have commenced constructing a wharf on the south side of the bay and channel, east of the Keyport dock, and further down the channel. The wharf as designed, will be within seventy-three feet of the complainants' wharf at the front, and within sixty feet of it at a point about forty-five feet south from the front; and will extend into the channel so as to reach navigable water, but not so far as the wharf of the complainants by about thirty feet. The front of this wharf is to be one hundred and twenty-five feet. When erected it will practically prevent the complainants from laying their present boats along the east side of their wharf, and from rounding them to in so convenient a manner as they have before done. The channel spoken of is not the channel of the bay, but a channel washed in the flats in front

of the shore of the bay, by the Matawan creek; that channel runs somewhat to the northeast, along the wharf of the complainants, and then along the intended wharf of the defendants. There is sufficient room in the channel north of the wharf of the complainants and of the proposed wharf of the defendants, for the convenient navigation of the channel by steamboats of any draft that can navigate it. But the room for the management and tacking of sail vessels is narrowed by both these wharves, and both prevent steamboats two hundred and forty feet in length, from being turned at low tide in the channel, with the same facility as could be done if they were not there. At low tide, the width of the navigable channel in front of the defendants' proposed wharf is one hundred and fifty feet; in front of the wharf of the complainants, it is from one hundred and twenty-five to one hundred and fifty feet. Both somewhat interfere with, neither obstructs navigation.

Both parties claim through grants of the owners of lands along the shore, and by acts of the legislature. Neither party disputes the title of the grantors of the other to the lands along the shore granted; the title to considerable extent being claimed through the same grantors. The owners having granted part of their land to the complainants, with its water rights, grant the adjoining part, with its water rights, to the defendants.

The complainants claim title by two deeds to them. The first from John C. Schenck, dated May 7th, 1851, conveys "an undivided fourth part of a certain lot of land, beach, and dock or wharf," giving metes and bounds, including lands along and on the shore to low water mark. The lands along the shore or high water line, have a front of fifty feet on the shore line; the lands on the shore, or between high and low water line, include the part of the wharf on the shore and lands forty feet east of it, and one hundred feet west of it from low water line to a boundary line drawn at right angles to the wharf, and about forty feet outside of high water line. This deed does not convey that part of the wharf which is

beyond the line of low water. The second deed is from Gideon S. Crawford, De Lafayette Schenck, and others, dated October 7th, 1859, and conveys three undivided fourth parts of the same lands and premises, calling them the Keyport dock lot, describing it by metes and bounds substantially the same, adding to the description these words : "Also, all the water and docking privileges, charter rights, store-houses, and corporate powers, to the same belonging or in any wise appertaining ; " but in no other way including that part of the wharf, below low water line. The wharf, as built at the date of both deeds, extended more than one hundred feet northerly beyond low water line, and its front extended considerably to the east of the easterly lines of the lands along the shore, and on the shore conveyed by these deeds ; and it had been so built prior to February 19th, 1851, the date of the charter of the Keyport Dock Company.

In connection with these deeds the complainants rely for their rights, and rely principally, upon the provisions of the act to incorporate the Keyport Dock Company, approved February 19th, 1851, (*Pamph. Laws* 25) which act was repealed by an act approved March 24th, 1864, (*Pamph. Laws* 467) which also transferred all the property, privileges, and franchises of the dock company, to the complainants.

It is upon the construction of the act to incorporate the Keyport Dock Company, that the questions in this cause principally arise. The complainants contend that it grants the wharf known as the Keyport dock as it then stood, and the right to extend the same in front and on either side, and to prevent any other wharf from being erected on either side so as to prevent free access to the sides of the same as it then was, or should be extended.

The defendants contend that the utmost effect that can be given to the act is to authorize the complainants to maintain the wharf as it then was, and to extend it in front of their own lands, or of adjoining lands, by consent of the owners ; and that it did not prevent the owners of adjacent lands along the shore, from building wharves in front of their lands, if au-

thorized by law, alongside of that wharf, in the same manner as adjoining shore owners may do by law or proper license: that the legislature did not intend to grant away or interfere with the rights or quasi rights of adjoining shore owners, but only to license, as against the public, what else might be a common nuisance.

The first section of the act is the only one that can be, or is relied on for the grant by the state. It enacts, " that John C. Schenck, De Lafayette Schenck, William L. Horner, Benjamin Griggs, Asbury Fountain, Gideon L. Crawford, and John Crawford, and their successors, are hereby constituted a body corporate by the name of ' the Keyport Dock Company,' for the purpose of continuing, keeping, and maintaining the dock or wharf now owned by the said company, and situate in the village of Keyport, township of Raritan, Monmouth county, and extending from said village into Raritan bay, and from time to time to repair or rebuild the same, and to extend or enlarge the same when necessary for the better accommodation of boats or vessels; *provided*, that such extension or enlargement shall not interfere with the navigation of said bay, river, or creek."

There can be no doubt that " the dock or wharf now owned by the said company," must be construed to mean now owned by the individuals composing said company. The wharf or wharf lot was never conveyed to the company, but the title to it was held by the individual corporators until they conveyed it to the complainants by the two deeds above mentioned, which were both executed before the franchises of the dock company were transferred to the complainants, but no question will be raised on that account in considering the effect of this act.

The defendants contend that the act being a grant by the state of rights and franchises, and taking away or limiting rights or privileges enjoyed by the people, must be strictly construed, and that nothing shall be taken as granted unless by the clear words of the act, or necessary implication therefrom. The rule of construction is too well settled to discuss,

or to support by citing authorities. They contend that there is no prohibition, either by express words, or by necessary implication from any provision of the act, by which the adjoining shore owner is restrained from building a wharf out alongside of the wharf, even if it prevents vessels from landing at the side of it. In this they are right. There is nothing in this act, more than in any other private dock act, or in the wharf act, that will deprive an adjoining shore owner from the like privilege, by charter or license, of wharfing out in front of his own lands. This never was the intention of the legislature; they have not expressed it, and it cannot be added to the act by implication, for it is not necessary to the enjoyment of the right granted, in the manner it was intended to be granted. The right of sailing a vessel in the waters sixty feet east of their wharf, was a right enjoyed by the defendants in common with all the inhabitants of the state; the legislature retained the right of excluding the complainants, as well as all others, from this part of the bay, in the same manner as they excluded the defendants and all other citizens from sailing or mooring their vessels in that part of the bay where the wharf of the complainants is. The exclusive right of the shore owner, as supposed to exist before the wharf act of 1851, and as confirmed or conferred by that act, is to the shore and lands under water *in front* of him, giving the same right to the adjoining shore owner, and *ex necessitate* excluding him from acquiring any right taking away the right of the adjoining shore owner. The same legislature that passed the charter, passed the wharf act on the 18th of March of that year, and were no doubt, at the passage of the charter, discussing and adjusting the provisions of the wharf act, and cannot be supposed by the charter to have intended, without expressing it, a grant that would deprive the adjoining owners of the benefits and rights positively conferred by that general act.

Besides, the court cannot, in construing this act, overlook the fact, that it does not confer, directly or by express words, even the power to maintain, re-build, or extend that wharf. The first section, which alone can be construed to contain

any grant, is drawn so as to confer directly, only the power of being a corporation. Its sole express enactment is, that the corporators are constituted a body corporate for certain purposes; and the only effect of the words expressing those purposes is, to limit the objects for which they are a body corporate. All beyond this is by mere implication. An act incorporating a company *for the purpose* of constructing a railroad from L. to M., with no further grant of franchises, would not confer the power of taking lands by the right of eminent domain, or even grant the lands owned by the state that might be crossed by the route. This act *may*, by implication, give the license of the state to maintain this wharf in navigable waters, built, as it was, in front of lands then owned by the corporators, and interfering with the rights of no other person. But, I apprehend, it cannot be construed to have any further effect, especially by mere implication, to take away the rights of the adjoining shore owner to the water in front of him, which this legislature were carefully providing to confirm and protect.

For the same reasons, the power to enlarge and extend the wharf, though given by express words, must be construed so as to authorize such extension in front of lands of the company only. The words are indefinite; without some limit, they would authorize this company to extend their wharf for miles on either side; in fact, to monopolize the whole south shore of the bay. If a wharf was proposed a mile to the east of their dock, they might ask for an injunction, on the ground that they might, at some day, want to extend their wharf there. This cannot have been the intention of the legislature. The wharf act passed that session, and, above all, an act passed the same day, and another on the twelfth of the same month, granting to seven other persons the right to build wharves in front of their lands, on the same side of the bay, and in this very village of Keyport, demonstrate that such was not their intention; there must be some limit, and there seems no other criterion to fix the limit, than the rule which has been suggested by jus-

tice and common sense, and for years adopted by the people, lawyers, and judges of New Jersey, as its common law, and by the legislature that passed the charter, in the wharf act, and the other acts alluded to; which rule is, that each shore owner shall be confined to the shore and lands under water in front of his own lands, and shall be entitled to them only.

This conclusion is arrived at by applying to the act well settled principles of construction, by which all public grants must be expounded and construed, without considering the question raised on the argument, whether, in New Jersey, the legislature has power to grant to a stranger the right to cut off a shore owner from access, and other advantages of adjacency, to the water directly in front of his shore along tide waters. If the principles of construction adopted are rightly applied, they are applied independently of this question. The question is considered by many as an open one in this state, and it is such, so far as any question is to be considered open upon which there is no direct judicial decision. It is one of the questions directly raised in this cause, and which it would have been necessary to decide, if the construction of the dock company's charter, contended for by the complainants, had been adopted. If the legislature had granted to them the right to wharf out in front of the lands of the defendants, or to the exclusive use of the waters in front of their lands, so as to prevent the defendants from using or reclaiming them, or from access over them, then it must have been determined in this cause, whether a shore owner has any vested right of access to, and use of the navigable tide waters in front of his land, that cannot be taken away without compensation.

I shall not here discuss or adjudicate this question, because, in the view I have taken of the dock company's charter, it is not necessary to the decision of the cause. But one of the grounds assumed for negativing any presumption of a grant by mere implication to lands under water in front of adjoining owners is, the prevailing impression, confirmed by the legislation of that session, that the shore owner has

some rights of adjacency and access to the lands under water in front of him. The case of *Gough* v. *Bell* had been decided in the Supreme Court a few months before this charter, and was determined in the Court of Errors the next year after it. If the position confidently taken by counsel, that the rulings in that case show every where that no such right existed or was acknowledged in the state, is true, it affects that ground. It is therefore proper, to sustain this ground of construction, as well as respectful to the eminent counsel, that the case of *Gough* v. *Bell* should be examined, so far as to ascertain whether this was the prevalent opinion of the judges and courts at that time; it might be wrong to assume that a different impression prevailed among the legislators to limit a supposed implication.

Does then the case of *Gough* v. *Bell* every where maintain the doctrine that the state may fill in, or authorize others to fill in, and appropriate the lands under water in front of any shore owner on navigable waters, and then cut them off from access to them? While the decision in that case does not determine the question either way, a majority of the judges who have given opinions in it, hold clearly the reverse of this to be law in New Jersey.

Chief Justice Green, in *Gough* v. *Bell*, 2 *Zab.* 461–2, says: "Notwithstanding the acknowledged title of the state, in her sovereign capacity, to the soil of navigable rivers below high water mark, there have undoubtedly existed, from a very early period, rights of the riparian proprietors, which have been recognized by the legislature, inconsistent with the idea of that exclusive property in the state sanctioned by the rule of the common law." And in the same case, on page 475, Justice Carpenter, after quoting with approval the opinion of Justice McLean, that the rights of a shore owner in the water are property that cannot be taken away, says: "If the doctrine, as thus propounded, can be maintained, the right of fishing upon his shore, the right of ferry, the right of access to the water, and even the right of accretion, belong to the shore owner, as incident to his position; it would seem to

follow that no grant for a mere private purpose can be supported, which interferes with the established right of such owner; it would simply be to take the property of one citizen in order to transfer it to another." In *Bell* v. *Gough*, the same case in the Court of Errors, Justice Elmer, 3 *Zab.* 670, says: "By the common law of New Jersey, the owners of land bounding on such rivers have an absolute and exclusive right to wharf out and otherwise reclaim and improve the adjoining shore to the ordinary low water line:" and on page 658, he says: "That the owners of land bounding on navigable water have an *absolute right* to wharf out and otherwise reclaim the land down to and *even below low water.*" On pages 675–6, Justice Potts says: "These rights" (of shore owners) "are as sacred and inviolable as any others. They are appurtenances to the estate and can no more be taken from him than any other portion of his property. He has a right, though his strict legal title is bounded by the high water line, to the water, as appurtenant to the upland; he has a right of landing, lading and unlading, and a right of way to the shore. He cannot be cut off from the water against his consent by any extraneous addition to his upland." Justice Ogden, on page 692, says that shore owners in New Jersey "have enjoyed, for their individual benefit and in private ownership, privileges upon the shore adverse to the exercise of the supreme power, excepting when employed for the protection of the common and paramount rights of navigation and of eminent domain." Justice Nevius, on page 685, says: "The owner of a freehold estate on the margin of tide water, has rights appurtenant to his freehold paramount to those of any other citizen; he has the right of ferry, of drawing seines, of passing to or from the water, of landing from or embarking in his boats, and to erect embankments, docks, or wharves, not interfering with the common rights of navigation, or any other common right; that he cannot be deprived of these rights by the prerogative of the crown, or by parliamentary or legislative power, except it be upon the doctrine of eminent domain." Again: Judge Valentine,

although he holds that the state may have the right to build wharves in front of a riparian owner, on page 710, says: " That if the state grants this land for private purposes, it loses its regalia and sovereignty. And the grantee would have no right to convert and change the nature of the soil to such purposes as would materially injure the rights of adjoining riparian owners." Judge Cornelison alone, of all the judges who gave opinions, is silent on this point. Of eight judges who delivered opinions, only one is silent; all the others, more or less strongly, maintain that in New Jersey the shore owner has vested rights in the waters in front of him that cannot be taken away. These opinions are not a decision in the case, but they are so clearly expressed, that it cannot be said that it appears by the case that such vested rights are not acknowledged in New Jersey. It would seem, on the contrary, that had the question been necessary to the decision of that cause, both the Supreme Court and the Court of Errors would have held that there were such rights. And not only the opinions of the judges, but the history of public, professional, judicial, and legislative opinion on this matter, largely given in that case, shows that this was, and had been for years, the prevalent view in the state, and must throw light upon the intention of the legislature in this act of incorporation.

The intention of the draftsman of an act, or the individual members of the legislature who voted for and passed it, if not properly expressed in the act, it is admitted, has nothing to do with its construction; the only just rule of construction, especially among a free people, is the meaning of the law as expressed to those to whom it is *prescribed,* and who are to be governed by it. If the legislator who enacted the law should afterwards be the judge who expounds it, his own intention, which he had not skill to express, ought not to govern. But circumstances known to all the public, such as what the law was at the time, or what it was supposed to be, are proper to be considered in looking for the intention of the legislature when not explicitly expressed

The remaining question in the case is, have the defendants a right to erect the wharf they are about constructing? They claim and show title to the lands in front of which the wharf is proposed to be built, by two deeds to them from the executors of De Lafayette Schenck: the first, dated March 27th, 1866, for a lot along the shore of Raritan bay, sixty feet in width along said bay, the west side of which is distant eighty feet eastwardly from the east side of the Keyport dock lot; the other is dated May 7th, 1866, and conveys all the land and water rights between the lot in the first deed and the Keyport dock lot. The title of De Lafayette Schenck, and the power of his executors to convey, are not disputed. The defendants claim their right to wharf out in front of their lot, not through a license from the freeholders, but by an act of the legislature, passed March 13th, 1866. At that time, George Kibbee was the equitable owner of the lands conveyed as above mentioned to the defendants, he having purchased them of the executors of De Lafayette Schenck, with whom he joined in these conveyances. This act granted "to him, his heirs and assigns, the right to build a wharf upon and in front of his lands on Raritan bay, extending into said bay a sufficient distance to accommodate vessels navigating the same; *provided* that said wharf should not obstruct the navigation of the said bay, and that that act should not affect the legal rights of any person." George Kibbee, by deed, on the 12th day of April, 1866, assigned the rights to the defendants.

It clearly confers on them the right to erect this wharf, unless it obstructs the navigation of the bay, or affects the rights of the complainants or other private rights.

As has been stated above, the wharf will not *obstruct* the navigation of the bay; it will interfere with the navigation of that part of the bay occupied by it, which to some extent was navigable before: this was intended by this act and all other similar acts, by the fact that the wharf is authorized to be extended out to accommodate vessels; every such wharf must somewhat interfere with navigation; vessels of less

draft than such as come up to it, could in all cases have passed over the site occupied by it.

Does this wharf affect the rights of the complainants? If, as contended by the complainants, shore owners have no rights whatever below ordinary high water line, along their natural bank, or their artificial embankment or wharf, except this common of navigation which all others enjoy in like manner, and if the state can grant to any one the right to erect and appropriate a wharf or dock in front of such high water line, there is an end to the question; the legislature could grant the right to build a wharf, not only along side but directly in front of the complainants' wharf; it is just as lawful to grant the right there as to grant it in front of the natural shore line of the defendants' land. The rights protected by the proviso of this act are only rights of property, vested rights; not the rights which the complainants enjoy in common with every other citizen, such as the right of sailing over or mooring boats upon the land covered with water to be occupied by this proposed wharf. If such were the rights protected, no wharf could be built by this act anywhere.

If the shore owner has any vested rights to the water, it is only to the water *in front* of his land or wharf, not along side of it. Such a right would defeat the right of an adjoining owner in his front, and is entirely inconsistent with either view taken of the rights of riparian proprietors.

The injunction applied for must be denied.*

