BOARD OF NATIONAL MISSIONS OF THE PRESBYTERIAN CHURCH IN THE UNITED STATES OF AMERICA, ET AL., APPELLANTS, v. AARON K. NEELD, DEPUTY DIRECTOR ACTING AS DIRECTOR, DIVISION OF TAXATION, DEPARTMENT OF THE TREASURY, RESPONDENT.

IN THE MATTER OF THE TRANSFER INHERITANCE TAX ASSESSMENT IN THE ESTATE OF ISABEL WALLACE, DECEASED.

Argued April 7, 1952—Decided May 5, 1952.

*Mr. Ira C. Moore, Jr.,* argued the cause for the appellants (*Messrs. Whiting, Moore & Phillips,* attorneys).

*Mr. Joseph Jansen* argued the cause for the respondent (*Mr. Theodore D. Parsons,* Attorney-General, attorney; *Mr. William A. Moore,* special counsel).

The opinion of the court was delivered by

OLIPHANT, J. . This appeal is from inheritance tax assessments levied against the Board of National Missions and the Board of Foreign Missions of the Presbyterian Church. The appeal, taken to the Appellate Division of the Superior Court, before argument there, was certified here on our own motion.

Isabel Wallace, the decedent here, died testate on December 11, 1948, and by the terms of her will and certain trust indentures she transferred to each of the appealing boards the sum of $33,934.32. The boards claimed before the Division of Taxation, Department of the Treasury, that they were educational institutions within the intendment of *R. S.* 54:34–4(*d*) and therefore entirely exempt from transfer inheritance taxes. The defendant, the deputy director of the Division of Taxation, held otherwise, determining that the boards fell within the category of transferees as set forth

in *R. S.* 54:34–2(*b*) as religious or charitable institutions and were therefore subject to a tax of five per cent on everything in excess of $5,000, as provided therein.

*R. S.* 54:34–2(*b*) levies a tax of five per cent on everything in excess of $5,000 on transfers of property to "churches, hospitals and orphan asylums, public libraries, Bible and tract societies, religious, benevolent and charitable institutions and organizations," while *R. S.* 54:34–4(*d*), as amended by *L.* 1948, *c.* 268, totally exempts transfers of property to or for the use of "educational institutions" provided that the exemptions shall not extend to transfers of property to educational institutions of other states, which do not grant the same exemption of transfers of property for the benefit of such institutions of this State. The State of New York grants this exemption.

The issue presented is, therefore, into which category do these boards fall; are they religious or educational institutions?

The Board of National Missions is a New York corporation and its purpose as stated in its charter is "the extension of Christianity and the Gospel of Christ in all its fullness and His service and all its implications in the United States of America and elsewhere as said general assembly (the governing body of the church) may direct by establishing and strengthening local churches, evangelism, organization and such special enterprises as may be deemed wise." In furtherance of its purpose the board owns and operates 24 boarding schools and 18 day schools throughout the United States, having an enrollment of 7,808, and in addition conducts Sunday schools and daily vacation Bible schools, the enrollment of the latter being 17,536. In addition the board maintains and operates missions, hospitals, dispensaries and community centers. It is said, and it will readily be conceded, that the program of this board is designed to improve and cultivate the religious, literary, social, physical, economic and recreational aspects of the population or community which it touches, and that all its activities are integrated

to bring the Gospel of Christ to the people in the mission fields and teach them to live as Christians.

The Board of Foreign Missions, likewise a New York corporation, was incorporated "for the purpose of establishing and conducting Christian missions outside the continental area of the United States of America, and the general diffusion of Christianity." The purpose of the board, as set forth in the affidavit of the chairman of its administrative committee, is likewise stated as "the general diffusion of Christianity," and all its activities, departments and projects are directed toward that end. The board operates or has a hand in operating 10,052 Sunday schools with an enrollment in excess of 723,000, and 1,775 elementary schools with an enrollment of over 150,000, also medical stations. In the field of its activity it seeks to build mental, physical and spiritual resources for the fullest self-realization by the individual, with complete development of character, personality and inspiration of nationals for the highest services of their community, their nation, their fellowmen and their God.

The general and basic argument of the appellants is that religious, benevolent and charitable institutions which are also educational institutions are exempt from transfer inheritance taxes. It is contended that the words "educational institutions" as used in the statute are not limited to schools and colleges in the ordinary sense but apply to any institution which carries on or performs an educational function. The two boards argue that the educational aspects of their activities are analogous to those performed by our leading Christian colleges in that they are endeavoring to prepare people to live their lives as Christians. They contend that teaching Christianity or religion is just as much educational as is the work and aim of the conventional school or college. They say in effect that their hospitals, dispensaries, community centers and the like are merely ancillary to their educational purpose, just as, for example, the athletic program of a university is to its principal educational purpose. The Division of Taxation takes a contrary view.

Statutes granting exemptions from taxation are to be strictly construed against a claimant and a claimant for tax exemption has the duty and burden of proving its entitlement to the exemption. *Sisters of Charity v. Cory,* 73 *N. J. L.* 699 (*E. & A.* 1906) ; *Trustees of Rutgers University v. Piscataway Township,* 134 *N. J. L.* 85 (*Sup. Ct.* 1946). To exempt property from a tax burden the statute must express the legislative intent to that and in clear and unmistakable terms. *Fairview, etc., Co. v. Fay,* 90 *N. J. L.* 427 (*Sup. Ct.* 1917), affirmed 91 *N. J. L.* 688 (*E. & A.* 1917). Statutes, particularly those dealing with taxation, must not be extended to include persons not intended and should not be construed more broadly or given any greater effect than their language requires, *Adams v. Atlantic County,* 137 *N. J. L.* 648 (*E. & A.* 1948). The statute here involved grants exemption to transferees "to or for the use of any educational institution" and makes no reference to the purpose for which the fund so transferred is to be devoted.

The claims for exemption here asserted must therefore depend on the appellants qualifying as educational institutions within the intent and meaning of these words as used in the statute. A basic rule of statutory construction is that words used therein "should be interpreted according to the most natural and obvious import of the language, without resorting to subtle or forced construction for the purpose of either limiting or extending their operations," *City Affairs, etc., Jersey City v. Dept. of Taxation,* 134 *N. J. L.* 198 (*Sup. Ct.* 1946), and in the absence of an indication of a specific meaning to be accorded thereto the ordinary meaning of the words is controlling. *Eckert v. N. J. State Highway Dept.,* 1 *N. J.* 474 (1949) ; *Ford Motor Co. v. N. J. Dept. of Labor,* 5 *N. J.* 494 (1950). In construing legislative acts, particularly tax laws, words in common use are to be taken in their ordinary signification. *Evening Journal Ass'n. v. State Board,* 47 *N. J. L.* 36 (*Sup. Ct.* 1885) ; *Storage Co. v. Assessors,* 56 *N. J. L.* 389 (*Sup. Ct.* 1894). To the ordinary average individual, the concept of a church is that it is a religious institution.

The ordinary meaning of "educational institution" is a place where classes are conducted, such as schools and colleges, not an institution which furnishes some education in no matter what branch, as an incidental adjunct to its main purpose. *Tappan Washington Memorial Corp. v. Margetts,* 9 *N. J. Super.* 212 (*App. Div.* 1950). In an opinion written by Justice Jacobs, when sitting in the Appellate Division, he dealt with the statutory provisions we are here concerned with. While the institution involved was an historical museum it is there stated, and we agree, that in common parlance the term "educational institutions," in its primary sense, would refer to universities and other schools where students are taught by instructors. We are convinced the legislative purpose in enacting the statute here involved was to exempt an institution whose primary aim and object was educational and not one whose educative function is in furtherance of another predominant purpose. An incidental qualification is not sufficient upon which to ground a claim for exemption.

These claimants must show that the primary purpose, the ultimate use or characteristics of their work, is that which the statute sets up as a basis for exemptions and this they have not done. *The Ministers, etc., Convention v. Thayer-Martin,* 118 *N. J. L.* 465 (*Sup. Ct.* 1937). The Legislature separately classified educational institutions in *R. S.* 54:34-4(*d*) and expressly removed them from the category of churches and religious institutions set up in section 2(*b*) of the act. This is strong indication and it will be presumed that it intended to designate for exemption those educational institutions whose primary aim is education and not those where the educational purpose is incidental to the attainment of some other, though higher purpose, *In re De Peyster's Estate,* 210 *N. Y.* 216, 104 *N. E.* 714 (*Ct. App.* 1914). The exemption granted those institutions enumerated in section 4(*d*) cannot be extended to those set forth in sec. 2(*b*). If this could be done the separate classifications would be meaningless.

Every church is engaged in the process of teaching people about Christ or some other Deity to the end that those it teaches may be able to lead a more satisfactory and useful life. If we accept the premise that because the teaching of people about Christ and Christianity often necessarily involves the teaching of many other things and that such work can be denoted educational in the statutory sense, then if this thought is followed to its logical conclusion, virtually every religious organization could be classified as an educational institution.

Certainly the ordinary church of itself would not be considered as within the classification of an "educational institution," yet these mission boards far more resemble the ordinary church than they do the ordinary school or college. In the ordinary school or college while religious subjects are taught and religion encouraged it is done in addition to their secular instructions. An Episcopalian or Catholic diocese is a religious organization and not an educational one, even though under their jurisdiction they may operate denominational or parochial schools or colleges. These appealing boards are religious organizations even though under their jurisdiction they operate schools or colleges in the ordinary sense. A bequest to a Catholic or Episcopalian church or diocese would be taxable as a transfer to a religious organization, whereas a testamentary gift to a particular school operated by the church or diocese would be tax exempt as a transfer to an educational institution. Similarly, a bequest to one of the schools operated by one of the appealing boards would be considered tax exempt as a transfer to an educational institution, but when it is to the boards themselves it must be considered as one to a religious organization. Any other interpretation of the statute would be an unwarranted perversion of the words "educational institution" and as a practical matter would result in the granting of exemptions to virtually every religious organization which the Legislature never intended.

We have construed that part of the statute *R. S.* 54:34-4(*d*), as amended, without resort to the explanatory statement attached to the bill when introduced. It has been the law of this State for nearly a century, the last pronouncement of which was as late as this year, that such a statement is not to be construed as an index of legislative intent in judicial exposition of the enactment. *Keyport Steamboat Co. v. Farmers Transportation Co.*, 18 *N. J. Eq.* 13 (*Ch.* 1866), affirmed *Ibid*, p. 511 (*E. & A.* 1866); *In re Hudson County*, 106 *N. J. L.* 62 (*E. & A.* 1929); *Raymond v. Township of Teaneck*, 118 *N. J. L.* 109 (*E. & A.* 1936); *Flagg v. Johansen*, 124 *N. J. L.* 456 (*Sup. Ct.* 1940); *Hoffman v. Hock*, 8 *N. J.* 397 (1952).

The rationale of the rule cannot be better expressed than as set forth by the former Supreme Court in *Flagg v. Johansen, supra*, where at *p.* 459 it said:

"But legislative intent on the passage of a measure is not to be deduced from so frail and unreliable a source. Such a statement is no part of the enactment. It is not even passed upon by the legislature or any committee thereof. It does not appear upon the official copy of the bill which comes before the houses for reading, debate and passage. It does not, we think, draw deep upon technical knowledge of the rules of statutory construction to discern that if such a statement be taken to express the frank and full purpose which the introducer of a bill imputes to his measure, the purpose which is thus evidenced is that of only one member of the legislature and that too at a time which precedes debate, amendment and passage. It may never have expressed the intent of the legislature as a whole and it may not correctly reflect, as of the time of enactment, the views of even the introducer. The imputed intent of any single member, or even of a minority bloc, of the legislature has no significance in judicial construction. This idea was clearly stated by Chancellor Zabriskie in *Keyport Steamboat Co. v. Farmers' Transportation Co.*, 18 *N. J. Eq.* 13, 24:

'The intention of the draftsman of an act, or the individual members of the legislature who voted for and passed it, if not properly expressed in the act, it is admitted, has nothing to do with its construction; the only just rule of construction, especially among a free people, is the meaning of the law as expressed to those to whom it is prescribed, and who are to be governed by it. If the legislator who enacted the law should afterwards be the judge who expounds it, his own intention, which he has not skill to express, ought not to govern.' "

We have held that where a statute is ambiguous on its face, which the one under consideration is not, the preamble and history of the legislation, under some circumstances, might be examined to ascertain the legislative intent, *Blackman v. Iles*, 4 *N. J.* 83 (1950); *Grobart v. Grobart*, 5 *N. J.* 161 (1950); *Bass v. Allen Home Improvement Co.*, 8 *N. J.* 219 (1951); but this is a far cry from a holding that the introducer's statement attached to the bill should be examined. All of these foregoing cases dealt with the use of preambles in determining legislative intent. A preamble to a bill is part and parcel of the bill itself, always remains a preface to it and becomes part of the legislative enactment.

Many statements attached to bills are not even prepared by the introducer and in many instances are solely designed to further their passage; they may be accurate or not. Committee reports in the consideration of proposed legislation, debates accurately recorded and gubernatorial messages are in an entirely different category as aids in determining legislative intent.

Cases in the federal jurisdictions are not guideposts to persuade us to reach a different determination of this question. Our Constitution, *Art. IV, sec. VII, par.* 4 provides that "* * * every law shall embrace but one object, and that shall be expressed in the title." There is no such provision in the Federal Constitution and it is common knowledge that acts of Congress are sometimes a hodgepodge of legislation. And the procedure followed in the process of the enactment of federal legislation is vastly different from our system. There, after bills are introduced committees consider them, often hold hearings on them and the formal committee reports are before the houses of Congress when votes are taken thereon. The debates on bills are reported stenographically. Of course, under such circumstances legislative history may possibly be an aid to ascertaining legislative intent. Our Legislature generally follows no such procedure. Rarely does a committee make a formal report, committee proceedings are seldom reported, and debates on the floor of

the Senate and House of Assembly are not stenographically reported. In the federal legislative procedure there is no such thing as a statement of an introducer being attached to proposed legislation.

Mr. Justice Holmes wisely said in *Pine Hill Coal Co., Inc., v. United States,* 259 *U. S.* 191, 42 *Sup. Ct.* 482, 66 *L. Ed.* 894 (1922) : "It is a delicate business to base speculations about the purposes or construction of a statute upon the vicissitudes of its passage." Particularly in this State the legislative intention must be gleaned from the statute as enacted, not from the expression of a single legislator which was not before the house of origin, the other house when the bill was considered there, or the Governor in the process of its enactment.

The key to the interpretation of the statute is to be found in the reasoning which must underlie the distinction which the Legislature made between religious and charitable institutions and educational institutions. The latter are undoubtedly granted total exemption from taxation, whereas religious and charitable institutions are not because educational institutions are assisting the State in its public function of educating its citizens.

The assessment made by the Division of Taxation, Department of the Treasury, is affirmed.

JACOBS, J. (concurring). Our Legislature has granted partial exemption from inheritance taxes on transfers of property to "churches, hospitals and orphan asylums, public libraries, Bible and tract societies, religious, benevolent and charitable institutions" (*R. S.* 54:34–2) and total exemption on transfers to "educational institutions." *L.* 1948, *c.* 268 (*R. S.* 54:34–4(*d*)). When I expressed the view in *Tappan Washington Memorial Corp. v. Margetts,* 9 *N. J. Super.* 212 (*App. Div.* 1950) that the Legislature meant to confine its total exemption to traditional educational institutions such as universities and other schools, I found support in the statement attached to *L.* 1948, *c.* 268, when originally intro-

duced as a legislative bill. It set forth that its purpose was "to encourage privately endowed higher education by making uniform the exemption from inheritance tax of bequests and devises to all educational institutions not operated for profit" and that its language would confine "the full exemption of bequests to such institutions as Princeton University, Rutgers University, the State University of New Jersey, the Institution for Advanced Study, Drew University, St. Peter's College, Seton Hall College, Upsala College, John Marshall College, Newark College of Engineering, Stevens Institute of Technology, and other privately-endowed nonprofit institutions at the elementary, secondary and higher educational levels in this State, and on a reciprocal basis in other States." However, in *Hoffman v. Hock,* 8 *N. J.* 397, 408 (1952) this court recently indicated that such statement may not in anywise be used as an extrinsic aid in the ascertainment of the legislative purpose, meaning or intent. *Cf.* Frankfurter, Some Reflections on the Reading of Statutes, 47 *Col. L. Rev.* 527, 538 (1947). I disagree with this view as being without basis in reason or support in persuasive authority elsewhere and take this first opportunity as a member of this court to record my dissent therefrom. See Landis, A Note on Statutory Interpretation, 43 *Harv. L. Rev.* 886 (1930); de Sloovere, Extrinsic Aids in the Interpretation of Statutes, 88 *U. of Pa. L. Rev.* 527 (1940); Note, A Re-Evaluation of the Use of Legislative History in the Federal Courts, 52 *Col. L. Rev.* 125 (1952). But *cf.* Jackson, J., in *Schwegmann Bros. v. Calvert Distiller's Corp.,* 341 *U. S.* 384, 395, 71 *S. Ct.* 745, 95 *L. Ed.* 1035, 1048 (1951).

Chief Justice Marshall struck early at the notion that extrinsic aids are inadmissible in the ascertainment of the legislative meaning by remarking in his common sense fashion that "Where the mind labours to discover the design of the legislature, it seizes everything from which aid can be derived." *United States v. Fisher,* 2 *Cranch* 358, 386, 2 *L. Ed.* 304, 313 (1804). Expressions of comparable import are readily found in recent decisions of the United States

Supreme Court. Thus in *Harrison v. Northern Trust Co.*, 317 *U. S.* 476, 479, 63 *S. Ct.* 361, 87 *L. Ed.* 407, 410 (1943) the court stressed that since words are inexact tools at best, there is wisely no rule forbidding resort to legislative history. And in *United States v. Dickerson*, 310 *U. S.* 554, 562, 60 *S. Ct.* 1034, 1038, 84 *L. Ed.* 1356, 1362 (1940) the court, while recognizing that particular legislative materials may be contradictory, ambiguous or without substantial probative value, pointed out that they can scarcely be deemed "incompetent or irrelevant" and that the meaning to be ascribed to congressional legislation "can only be derived from a considered weighing of every relevant aid to construction."

In *McFadden v. Pennsylvania R. R. Co.*, 130 *N. J. L.* 601 (*Sup. Ct.* 1943) our former Supreme Court availed itself of legislative history in ascertaining the meaning of a congressional enactment. Similarly, when seeking to ascertain the meaning of provisions of our State Constitution this court has freely used all available constitutional history. See *Imbrie v. Marsh*, 3 *N. J.* 578 (1950); *Winberry v. Salisbury*, 5 *N. J.* 240 (1950). Indeed, in the *Winberry* case the court placed some reliance on a gubernatorial veto message and in *Koch v. Koch*, 79 *N. J. Eq.* 24, 29 (*Ch.* 1911) the court expressed the opinion that it could properly use a commission report and gubernatorial message as aids in interpreting an ensuing legislative enactment. *Cf. Delaware L. & W. R. Co. v. Division of Tax Appeals*, 2 *N. J. Super.* 93, 98 (1949), affirmed 3 *N. J.* 27 (1949), app. dism. 338 *U. S.* 946, 70 *S. Ct.* 488, 94 *L. Ed.* 583 (1950); *Ablondi v. Board of Review*, 8 *N. J. Super.* 71, 75 (*App. Div.* 1950); *Family Finance Corp. v. Gough*, 10 *N. J. Super.* 13, 21 (*App. Div.* 1950). It is true that notwithstanding the foregoing we sometimes find reexpression in our cases of the generally discarded view that in construing a legislative enactment the court may not look beyond the words of the statute itself. See *In re Hudson County*, 106 *N. J. L.* 62, 73 (*E. & A.* 1928). But *cf. Stone, The Province and Function of Law*, p. 200 (1950). However, this may be contrasted with our settled

doctrine that contemporaneous administrative construction will be given weight in ascertaining the meaning of the legislative language. *Harper v. New Jersey Mfrs. Cas. Ins. Co.,* 1 *N. J.* 93, 98 (1948); *Kravis v. Hock,* 137 *N. J. L.* 252, 255 (*Sup. Ct.* 1948). See Cox, Judge Learned Hand and the Interpretation of Statutes, 60 *Harv. L. Rev.* 370, 390 (1947) where the author pointed out that "The rule that administrative interpretations are entitled to great weight rests on a basis similar to that justifying recourse to the legislative history." It may be further contrasted with the broadening concepts of our courts which enable the use of pertinent extrinsic materials in ascertaining the proper meaning of written contracts and other private instruments. *Cf. Casriel v. King,* 2 *N. J.* 45, 50 (1949).

In *Flagg v. Johansen,* 124 *N. J. L.* 456, 459 (*Sup. Ct.* 1940) the court described the introducer's statement as a "frail and unreliable" source of legislative intent which should not be considered. It seems to me that this fails to distinguish between legal admissibility and weight. The introducer's statement clearly constitutes relevant evidence on any proper issue as to the legislative purpose, meaning or intent; it sets forth the interpretation of the draftsman or sponsor of the legislation, is circulated amongst his fellow members of the Senate or Assembly, as the case may be, and becomes a matter of record available for inspection by all, then and thereafter. It may be very complete and embody a fully documented narrative of purpose entitled to substantial consideration. See *e. g.,* Assembly No. 15 introduced on March 21, 1952, and bearing a statement which is in form comparable to a detailed committee report. On the other hand it may be inadequate and perhaps misleading and entitled to little consideration. But before this court can tell what kind of statement it is it must have the privilege of looking at it, and that is what *Flagg v. Johansen* denied. I, for one, am for removing the blinkers. See *Winne v. Casale,* 100 *N. J. L.* 291, 295 (*E. & A.* 1924) where Chief Justice Gummere found significance in the introducer's statement and *Schweg-*

*mann Bros. v. Calvert Distiller's Corp., supra,* where Justice Douglas remarked that "It is the sponsors that we look to when the meaning of the statutory words is in doubt." In construing particular statutory phraseology such as that embodied in *L.* 1948, *c.* 268 we must, unless we are to usurp functions of the other branches of government, seek to ascertain and effectuate the legislative meaning rather than our own. To that task we should bring minds unafraid to explore.

Justice BRENNAN joins in this opinion.

WACHENFELD, BURLING, JACOBS and BRENNAN, JJ., concurring in result.

*For affirmance*—Chief Justice VANDERBILT, and Justices OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN —6.

*For reversal*—Justice HEHER—1.