LASSER, P.J.T.C.
In this action plaintiffs contest a deficiency tax assessment in the amount of $98,363.35, plus interest, imposed by the Director of the Division of Taxation on sales of copper wire, pursuant to the New Jersey Sales and Use Tax Act, N.J.S.A. 54:32B~1 et seq. Plaintiffs contend that these sales are exempt under N.J.S.A. 54:32B-8.20 as sales of materials, such as chemicals or catalysts, used to induce or cause a refining or chemical process in the manufacture of tin cans.
Phelps Dodge Industries, Inc. manufactures and sells a type of copper wire which is used in manufacturing cans. Allstate Can Corporation, American Can Corporation, Continental Can, Crown, Cork and Seal, George A. Milton Can Company and National Can Corporation each purchased from Phelps Dodge various quantities of copper wire, which they utilized in manufacturing cans. Phelps Dodge has paid the deficiency assessment plus interest, and has been reimbursed by the other plaintiffs. Plaintiffs seek to set aside the deficiency assessment and obtain a refund of the amount paid.
The first step in the manufacture of a can is to form tin-coated steel into a cylinder by welding the overlapping edges together in a continuous seam. This is accomplished with a soudronic machine, using a process which involves “mash seam resistance welding.” The weld is made by applying heat and pressure to the two exterior surfaces to create a weld nugget on the two overlapping interior surfaces. Heat and pressure are transmitted to the can metal by revolving roller electrodes (primary electrodes) through the subject copper wire, which acts as an intermediate electrode. Heat is created by the resistance of the metal to the flow of electricity from the electrodes. The primary electrodes do not come in contact with the can stock. The copper wire, which is continuously fed through grooves in the primary electrodes, makes contact with *357 the exterior surfaces of the can stock. The copper wire does not come in contact with the interior surfaces that are to be welded. A series of electrical charges run through the primary electrodes and the copper wire to the weld site, raising the temperature of the can stock to the point at which the steel reaches a plastic state. While the can stock is in this state, weld nuggets form in the fusion zone, creating a welded seam running the length of the cylinder.
Because the tin coating melts at a lower temperature than the steel can stock, the tin at the weld site becomes fluid during the heating process. If the constantly moving, clean copper wire were not present, the tin would adhere to the primary electrodes. This would interfere with the flow of electricity by varying the resistance, resulting in either imperfect welds or, in the extreme, no welds at all. The role of the moving copper wire is to prevent, by acting as an intermediate electrode, the tin buildup on the primary electrodes, and thereby provide a consistently clean contact at the point of heat application, permitting the machine to maintain a constant temperature at the seam. In addition to presenting its own, consistently clean surface, the copper wire carries away from the weld site some of the melted tin and tin contaminants which adhere to it by physical, not chemical, means. After use, the copper wire is chopped into small pieces for scrap salvage.
The soudronic machine produces 800 welds a second and 100-120 cans a minute. If the copper wire were not used to prevent tin buildup, the machine would have to be stopped to remove tin from the primary electrodes, and the production rate would be reduced to two cans per minute.
The issue before the court is whether, as plaintiffs contend, the copper wire is material, such as chemicals or catalysts, used to induce or cause a refining or chemical process.
N.J.S.A. 54:32B-8.20 provides:
Receipts from sales of materials, such as chemicals and catalysts, used to induce or cause a refining or chemical process, where such materials are an integral or essential part of the processing operation, but do not become a *358 component part of the finished product are exempt from the tax imposed under the Sales and Use Tax Act.
The copper wire is essential to high volume welding of cans by the soudronic process and does not become a component part of the finished product, the welded can.[1] Plaintiffs contend that the copper wire is a material, like a catalyst, that induces or causes (1) a refining process by removing some tin and tin contaminants from the outside surface of the weld area, preventing contamination of the primary electrodes, thus avoiding imperfect welds, and (2) a chemical process because chemical changes occur during the welding process. Plaintiffs argue that the copper wire removes contaminants from the surface and refines the weld by making it continuous and consistent. Defendant contends that the copper wire does not induce or cause a refining or chemical process but is merely an intermediate, disposable electrode that is a part of the welding process.
The general rule of interpretation of tax exemptions is that they are to be strictly construed, because an exemption from taxation is a departure from the equitable principle that everyone should bear his just and equal share of the public tax burden. Taxation is the rule; exemption is the exception to the rule. The legislative design to release one from his just proportion of the public burden should be expressed in clear and unequivocal terms. Board of National Missions v. Neeld, 9 N.J. 349, 353, 88 A.2d 500 (1952). The burden is upon the claimant to clearly bring himself within an exemption provision. Ibid. Tax exemptions are not favored, and doubts are to be resolved against one claiming the exemption. Bloomfield v. Academy of Medicine, 87 N.J. Super. 595, 210 A.2d 420 (App. Div.1965), rev’d on other grounds 47 N.J. 358, 221 A.2d 15 (1966). It must be noted, however, that strict construction does not require a rigid interpretation that does not serve the apparent legislative purpose; rather, a statute is to receive a reason *359 able construction. Alexander v. N.J. Power and Light Co., 21 N.J. 373, 378, 122 A.2d 339 (1956). This qualification of reasonableness, however, does not negate a constructional preference for the taxation of property. Container Ring Co. v. Taxation Div. Director, 1 N.J.Tax 203, 208 (Tax Ct.1980), aff’d o.b. 4 N.J.Tax 527 (App.Div.1981), certif. den. 87 N.J. 416, 434 A.2d 1090 (1981).
I. § 8.20 Decisional Law.
Because the § 8.20 exemption does not come within the general philosophy of the sales tax, because there is no legislative statement[2] accompanying its enactment and because the Director has not promulgated any regulations for its administration,[3] the interpretation of the statute must rely on the plain meaning of the words of the statute taken as a whole, and on decisional law. See Levin v. Parsippany-Troy Hills, 82 N.J. 174, 182, 411 A.2d 704 (1980); Denbo v. Moorestown Tp., 23 N.J. 476, 481, 129 A.2d 710 (1957); In re Keogh-Dwyer, 45 N.J. 117, 120, 211 A.2d 778 (1965). Reported court decisions which deal with the issue of whether specific materials cause or induce a refining or chemical process are: Ramac Explosives, Inc. v. Taxation Div. Director, 125 N.J.Super. 154, 309 A.2d 465 (App.Div.1973), aff’d but mod. 64 N.J. 551, 319 A.2d 65 (1974); Hospital Portrait Service Co. v. Taxation Div. Director, 6 N.J.Tax 305 (Tax Ct.1983), aff’d o.b. 7 N.J.Tax 431 (App.Div.1984), certif. den. 101 N.J. 235, 501 A.2d 912 (1985); Kalpin v. Taxation Div. Director, 5 N.J.Tax 172 (Tax Ct. 1983), aff’d 6 N.J.Tax 258 (App.Div.1984); Tuscan Dairy Farms, Inc. v. Taxation Div. Director, 4 N.J.Tax 92 (Tax *360 Ct.1982); Xcel Corp. v. Taxation Div. Director, 4 N.J.Tax 85 (Tax Ct.1982), aff’d o.b. 5 N.J.Tax 480 (App.Div.1982); Grinding Balls, Inc. v. Taxation Div. Director, 176 N.J.Super. 620, 1 N.J.Tax 514, 424 A.2d 470 (Tax Ct.1980).[4]
In Ramac, supra, the Appellate Division held that dynamite was a material that qualified for exemption because blasting separates out impurities and “reduces the ledge rock to a manageable and commercially useful size and quality so that the resulting stone may meet specifications established by various customers....” 125 N.J.Super. at 157, 309 A.2d 465.[5] In the subject case, the copper wire does not induce or cause a refining process which produces the end product. It only prevents tin buildup on the primary electrodes, which facilitates the welding of the seam. Ramac does not stand for the proposition that cleaning in the course of production is refining or that cleaning, no matter how minor, is a refining process qualifying the cleaning material for exemption.
Not every refining activity or chemical change qualifies a material for exemption. Only when an activity constitutes a refining or chemical process which leads directly to production of the finished product will the material inducing or causing such process be exempt. In Tuscan Dairy Farms, supra, plaintiff, a milk processor, used certain chemicals to clean and sanitize its milk lines, fillers and tanks to insure production of bacteria-free milk. This cleaning operation preceded plaintiffs milk processing, or pasteurizing, operation. Plaintiff contended that the cleaning process was a part of a single cycle or process which culminated in its finished product and that therefore its *361 purchases of cleaning and sanitizing agents were exempt from sales tax. The Tax Court disagreed and stated:
It is clear from the quoted language [§ 8.20] that the processing operation dealt with in the statute is only that process which results in a finished product, in this case the various milk products of plaintiff. Plaintiffs cleaning and sanitizing operation is separate from the milk processing operation and does not produce a finished product____ Even if the chemicals are used to induce or cause a refining or chemical process, as alleged by plaintiff, the refining or chemical process is part of the cleaning and sanitizing operation, not the milk processing operation. Since the chemicals are not used in the milk processing procedure that results in marketable milk products, their purchase does not fall within the sales tax exemption established by N.J.S.A. 54:32B-8.20. [4 N.J.Tax at 95; emphasis supplied]
In Kalpin, supra, taxpayer sought a sales tax refund on purchases of sands, binders and washes used to produce cores or molds for iron castings, the castings being the finished product. 5 N.J.Tax at 173. The Tax Court denied the refund, finding that the materials were not used to induce or cause a refining or chemical process. In that case plaintiff contended that the term “refining” should be broadly interpreted to include improving the quality of a product, arguing that varying the type and proportion of sands, binders and washes in the mold improves the quality of a casting. The court rejected this argument and agreed with defendant’s expert that “the process of producing an iron casting is not a refining process” and that “the term ‘refining’ applied only when impurities or extraneous matter are removed from a product.” Id. at 178.
The court also found that the casting process was “essentially a physical process,” that no chemical action was intended between mold ingredients and the molten metal, and in a footnote the court stated:
As defendant correctly points out, plaintiff does not contend that the process involving the making of the mold itself is a chemical process sufficient to satisfy the exemption requirements. As this court held in Tuscan Dairy Farms, Inc. v. Taxation Div. Director, 4 N.J.Tax 92 [Tax Ct.] 1982) a § 8.20 exemption is permissible only for materials used to induce or cause a chemical or refining process [which results] in the finished product. That process is not the making of the mold. [Id. at 179 n. 4]
The court, in Hospital Portrait Service, supra, relying on Tuscan Dairy Farms and Kalpin, held that the production of photographs involves two separate and distinct processes, the *362 processing of color film into color negatives and then the processing of color prints from the color negatives, with the final product being the color prints produced from the color negatives. 6 N.J.Tax at 311. The court there held that since the negatives, not the film, are used in the print processing procedure which results in the finished product (the color prints), plaintiff’s purchases of film are not exempt from sales tax under § 8.20.
The court held in Tuscan Dairy Farms and Hospital Portrait Service and noted in Kalpin that the chemical or refining process had to directly produce the end product in order to entitle the material used to cause or induce the chemical or refining process to exemption.
In Xcel Corp., supra, plaintiff was in the business of manufacturing cellulose acetate film and sheet for use as sound recording and audio-visual tape. In the first stage of the manufacturing process, processing aids were mixed with a white, flake-like material to produce a cellulose acetate solution. The solution contained impurities and contaminants. The critical stage in plaintiff’s manufacturing process was filtration, during which the solution was passed through two sets of filter presses which contained cloth filter pads. The court held that the filter pads were materials used to cause a refining process, that the use of cloth filter pads at this critical stage in the manufacturing process came within the Ramac definition of a refining process, and therefore the filter pads were exempt from taxation. 4 N.J.Tax at 91. Unlike the subject case, the filtration process was a primary and critical step in the production of the tape, the tangible personal property end product.
Grinding Balls, supra, involved the sale of metal grinding balls used primarily in paint, cement and coal businesses to reduce, by a grinding process, the size of certain materials into a powdery form. The court held that “[t]he grinding of particles into a powdery state does not remove any impurities from the initial component nor does it produce a final product that differs chemically.” 176 N.J.Super. at 625-626, 1 N.J.Tax at *363 519, 424 A.2d 470. The grinding was held to be a physical process, and therefore the grinding balls were not exempt on the ground that they induced or caused a refining or chemical process. In the subject case, the copper wire does not act to purify the end product.
It is the general scheme of the Sales and Use Tax Act with regard to manufacturing that the end product, if it is tangible personal property, is subject to sales and use tax[6], as are manufacturing supplies, tools and parts with a useful life of one year or less.[7] However, raw materials which become a part of the tangible personal property end product[8], and the machinery and equipment[9] used directly in the production of the end product, are exempt. The raw materials that become a part of the end product are exempted from taxation to avoid the pyramiding of tax on tax that would occur if these items were taxed in their unmanufactured state and again in their manufactured state. Machinery and equipment are exempted as a matter of legislative policy to encourage manufacturing. Supplies, tools and parts with a useful life of less than one year do not become a part of the finished product and therefore do not come within the policy which prevents pyramiding.[10] The cop *364 per wire is a supply which is expended in the manufacturing process and does not become a part of the tangible personal property end product. The copper wire is therefore taxable on purchase, unless it comes within the special exemption provided in § 8.20. It was not intended that § 8.20 should exempt supplies that perform cleaning functions as incidental aspects of a manufacturing operation. The words “used to induce or cause a refining or chemical process” indicate that the process must be more significant in the manufacture of the end product than simply maintaining clean primary electrodes in the welding of the seam on a tin can, regardless of how essential clean, primary electrodes are to the weld.
Plaintiffs’ metallurgical expert defined process as “a series of events.” Webster’s New Collegiate Dictionary (1980) defines process as “a continuous operation or treatment____” Id. at 910. Not every cleaning or refining action is a refining process, and not every chemical change is a chemical process. I find that the statute contemplates the production of the end product by a refining or chemical process. In the subject case the end product is a tin can. The can is produced by a manufacturing process, not a refining or chemical process. We are dealing with only one phase of the manufacturing process, the welding of the seam to create the cylinder and, in particular, that aspect of the welding process in which the copper wire prevents the tin from building up on the primary electrodes. The copper wire keeps the primary electrodes clean. It does not clean the end product. The action of the copper wire is not a process in and of itself. The copper wire is part of the welding process. Welding is not a refining or chemical process.
II. Refining Process.
The Director has defined refining as “the making fine or pure, or partially free from extraneous or undesirable matter.” N.J.A.C. 18:24-4.2. The Condensed Chemical Dictionary (9 *365 ed. 1977) defines refining as “essentially a separation process whereby undesirable components are removed from various types of mixtures to give a concentrated and purified product.” Id. at 746. The action of the copper wire in preventing tin buildup on the primary electrodes is not a refining activity within the meaning of either the Director’s definition or the chemical dictionary definition. Removal by the copper wire of some tin and tin contaminants[11] from the exterior surface is not necessary to produce the weld and is only an incidental result of the transmission of heat and pressure by the copper wire. Because it is incidental, this removal is not a refining process contemplated by § 8.20. I am persuaded by the following testimony of defendant’s metallurgical expert, in response to the question, “Is the cleaning of the surface by the copper wire a refining process?”
The copper wire is not really cleaning the surface. The copper wire, by virtue of the fact that we always have a clean copper wire, we have a constant contact area and a constant resistance. That’s the essence. In other words, we want always clean contact. You know, it’s continuously providing a clean contact surface. There is no oxidation. There is no dirt. The fact that you happen to pick up some of the tin is incidental to the process.
Further, the copper wire does not constitute or induce or cause a refining process. It is only a part of the welding process. Gasoline is an example of a product produced by a refining process. Because a tin can is produced by a manufacturing process, not a refining process, the copper wire cannot be regarded as inducing or causing a refining process.
I accept the testimony of defendant’s metallurgical expert that the copper wire does not induce or cause a refining process.
III. Chemical Process.
Plaintiffs’ metallurgical expert testified that welding is a physical, a metallurgical and a chemical process. He defined a *366 chemical change as “a change in which one or more materials change into one or more chemically different materials; a rearrangement of elements, atoms or molecules into chemically different identities.” He testified to chemical changes occurring to impurities in the tin and steel during the welding process, but did not testify that these changes were necessary to effect the weld.
The defendant’s metallurgical expert testified that welding is a physical process and that chemical reactions that may occur during the welding process are only incidental and unnecessary by-products of that process. He testified that:
When you change the state, in other words, in the fusion welding, we go from solid to a liquid, back to a solid. That is a physical process. We have a state, a physical change. Then the physical state was changed. First it is solid; then it becomes liquid; then it becomes solid again. This is considered as a physical change. Now, within this physical change there might be chemical changes taking place. For example, we might have, as you go to some high temperature, there might have been some oxides. Now, some oxides decompose at higher temperatures. Other oxides might form, so that in the process you might have some chemical changes within this heated region. But the essential feature, the feature that gives us the joint, is not the chemical changes. It is the physical changes of going from the solid to the liquid stage, merging these two materials and then cooling again, going back to becoming solid again, and that effected and gave us the two becoming one.
I find defendant’s expert’s testimony more persuasive, and conclude that the copper wire does not constitute or cause , or induce a chemical process. Chemical changes in the contaminants in the tin and steel that result from the welding process are not the purpose of the process. They are an unnecessary by-product, and are merely incidental to the welding process. Therefore, these chemical changes are not a chemical process in themselves which would justify an exemption for the copper wire.
IV. Conclusion.
I find that the continuously-moving copper wire, although it prevents a tin buildup on the surface of the primary electrodes, does not induce or cause a refining process. I find further that although there may be chemical changes in the contaminants in the tin and steel as a result of the welding process, these *367 changes are not the purpose of the welding process. Therefore, the chemical changes are not a chemical process which would justify an exemption for the sales of copper wire.
Since the copper wire does not constitute or cause or induce a refining or chemical process, sales of the copper wire are not exempt from sales and use tax under N.J.S.A. 54:32B-8.20. The Clerk of the Tax Court is directed to enter judgment in favor of defendant, affirming the deficiency assessment.

 Some copper may be deposited on the can stock as the wire passes over the can stock, but the deposited copper is incidental to and cannot be regarded as a component part of the finished product.

 Referring to the Assembly Taxation Committee public hearing of June 8, 1972, Justice Pashman, in his dissent in Ramac Explosives, Inc. v. Taxation Div. Director, 64 N.J. 551, 319 A.2d 65 (1974), stated: "[i]t was clearly indicated that the Section 8(t) exemption [now § 8.20] was intended to apply to catalysts used in chemical refining operations such as petroleum refining." Id. at 554, 319 A.2d 65.

 N.J.A.C. 18:24-4.5(b) merely restates the statutory language of § 8.20.

 I have not included a discussion of the following cases. Metpath, Inc. v. Taxation Div. Director, 96 N.J. 147, 474 A.2d 1065 (1984), although dealing with § 8.20, did not deal with the question of whether the chemical induced or caused a refining or chemical process. Millington Quarry, Inc. v. Taxation Div. Director, 5 N.J.Tax 144 (Tax Ct.1983), dealt not with § 8.20 but with the definition of refining and, citing Ramac, the court there held that refining begins at the rock face of the quarry. Id. at 153-154.

 This holding was affirmed by the Supreme Court. 64 N.J. 551, 319 A.2d 65.

 N.J.S.A. 54:32B-3(a).

 N.J.S.A. 54.-32B-8.13.

 N.J.S.A. 54:32B-2(e)(1)(A), -3(a).

 N.J.S.A. 54:32B-8.13(a).

 Justice Schreiber in Metpath, Inc. v. Taxation Div. Director, supra, stated: Thus it can be seen that the general legislative intent was to impose the tax on sales of tangible personal property unless that property was to be resold by the purchaser. The contemplation was that the tax in such a situation would be incurred on resale. The theoretical justification for the resale exemption was “the desire to avoid pyramiding taxes as goods move along the channels of distribution toward the market place.” Redlich, “Sales, Taxes and the Resale Exemption in the Manufacture and/or Distribution of Personal Property,” 9 Tax L. Rev. 435, 436 (1954). In furtherance of the policy against double taxation of a single product, the Act has long exempted from the tax on sales not only the sale of personal property that *364 is resold but also the sale of personal property that becomes a component part of a finished product that is then sold. [96 N.J. at 151, 474 A.2d 1065]

 The tin used in the coating is only 95.5% pure. The remaining 4.5% are contaminants. When the molten tin adheres to the copper wire, some of the tin and contaminants are carried away by the copper wire. The carrying off of some tin and contaminants is not for the purpose of purifying the tin or the can.